UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

## AFFIDAVIT IN SUPPORT OF A CRIMNIAL COMPLAINT AND ARREST WARRANT

I, Brendan M. Shelley, being duly sworn, depose and state as follows:

### I. INTRODUCTION

1. I am a Special Agent employed by the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE). I am assigned to ICE Homeland Security Investigations (HSI) – Washington, D.C. I have been employed as a Special Agent with ICE since October 2007. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ICE Special Agent Training Program. My duties as a Special Agent for ICE include investigating administrative and criminal violations of the Immigration and Nationality Act, United States customs laws and other federal criminal violations to include wire fraud, bank fraud and money laundering. Prior to becoming a Special Agent, I was an ICE Management and Program Analyst with ICE's Office of the Principal Legal Advisor.

2. This affidavit is submitted in support of a criminal complaint and arrest warrant charging that from in or about February 2014 through in or about October 2014, within the District of Columbia and elsewhere, the defendant Hanan Al Sharaf, conspired to violate Title 18, United States Code, Section 1956(h). Specifically, as set forth below, Hanan Al Sharaf did knowingly and intentionally conspire with other persons known and unknown to knowingly conduct or attempt to conduct financial transactions with property representing the proceeds of the specified unlawful activities of bank fraud (18 U.S.C. § 1344(2)) and wire fraud (18 U.S.C. § 1343) knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified

unlawful activity in violation of 1956(a)(1)(B)(i) and that the criminally derived property involved in each transaction was of a value greater than $10,000 and was derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

3. This affidavit is based on my personal observations during the course of this investigation, information conveyed to me by other law enforcement officials, my review of records, documents and other physical evidence obtained during this investigation and interviews of witnesses. This affidavit contains information necessary to support a finding of probable cause, but does not include each and every fact observed by me or known by the government.

## II. THE DEFENDANT

4. Hanan Al Sharaf is an adult female who was born in Kuwait. Al Sharaf entered the United States on or about January 19, 2014 on an A-1 Non-Immigrant Visa, and on or about July 10, 2011 on an A-2 Non-Immigrant Visa. Al Sharaf was previously the Financial Attaché for the Kuwaiti Health Ministry in Washington, D.C. According to the U.S. Department of State, Al Sharaf's diplomatic status was terminated on or about December 10, 2014.

## III. BACKGROUND INFORMATION

5. The State of Kuwait is an Arab country located in the Middle East. Kuwait operates embassies throughout the world, including an embassy located in Washington, D.C. The Embassy of Kuwait in Washington, D.C. operates the Kuwait Embassy Health Ministry (also known as the Kuwait Health Office, also known as the Kuwait Health Division, herein referred to as Heath Ministry). The Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 330 in Washington, D.C.

6. The mission of the Health Ministry is to pay for health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States. Kuwaiti citizens requiring

medical attention sometimes travel to foreign countries in order to receive medical attention. The Health Ministry's core responsibilities are to 1) coordinate care provided by medical service providers, 2) arrange for medical care providers to be paid with government funds for services provided, and 3) pay patients and their families a bi-weekly stipend for travel and living expenses. All expenses associated with the operation of the Health Ministry are paid for by the Government of Kuwait.

7. In 2014, the Health Ministry office located in Washington, D.C. was overseen by a Senior Health Ministry official and Financial Attaché Hanan Al Sharaf.

8. The Health Ministry maintains a Bank of America bank account in Washington, D.C. The account is funded each month by wire transfers originating from the Kuwaiti government.

## IV. THE CONSPIRACY

9. The primary purpose of the conspiracy was to for members of the conspiracy to enrich themselves by embezzling funds from the Bank of America bank account maintained by the Health Ministry. The ways, manner and means by which the conspiracy was carried out included the following:

> a. It was part of the conspiracy that members of the conspiracy would use checks drawn on the Health Ministry's bank account in order to make unauthorized payments to companies that did not provide any services (the "shell companies").
>
> b. It was further part of the conspiracy that members of the conspiracy would create shell companies, using names that closely resembled actual health care providers to make them appear legitimate, in order to conceal embezzlement activity.
>
> c. It was further part of the conspiracy that members of the conspiracy would open bank accounts for the shell companies in order to conceal embezzled funds.

    d. It was further part of the conspiracy that members of the conspiracy would transfer embezzled funds from the shell company accounts to the bank accounts of other members of the conspiracy, and distribute embezzled funds in cash payments.

    e. It was further part of the conspiracy that members of the conspiracy would access transaction records in order to edit information associated with prior payments.

10. Co-conspirators knowingly executed a scheme to obtain money or property owned by or under the custody and control of Bank of America by false and fraudulent pretenses in violation of Title 18 United States Code, Section 1344(2). Furthermore the co-conspirators willfully and knowingly devised a scheme to obtain money and property by means of false pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, knowingly and intentionally caused to be transmitted by means of wire in interstate commerce writings, signs, and signals for the purpose of executing such scheme and artifice to defraud in violation of Title 18 United States Code, Sections 1343 and 2.

11. Co-conspirators agreed to embezzle approximately $2 million in Health Ministry Funds. The financial records reviewed to date reveal that at least $250,000 was paid by the Health Ministry to the shell companies.

## V. PROBABLE CAUSE

### A. INFORMATION PROVIDED BY SOURCE OF INFORMATION 1

11. In November 2014, ICE HSI was contacted by a source of information (herein referred to as SI-1) concerning suspected embezzlement activity at the Kuwait Health Ministry in Washington, D.C. SI-1 was previously employed as an accountant with the Health Ministry from approximately June 2013 until September 2014. SI-1 stated SI-1 had knowledge of Health Ministry employees who were embezzling Health Ministry funds and laundering the stolen money using various shell corporations.

12. On November 3, 2014 and again on February 26, 2015, I interviewed SI-1. SI-1 stated in sum and in substance:

    a. SI-1 was previously employed by the Health Ministry from approximately June 2013 until September 2014;

    b. SI-1 reported to the Finance Attaché, Hanan Al Sharaf;

    c. the mission of the Health Ministry is to pay for the health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States;

    d. it was not uncommon for Kuwait nationals to travel to foreign countries in order to receive medical treatment;

    e. Kuwait operates health ministries in several foreign countries, including the United States;

    f. Kuwaiti nationals seeking medical attention in the United States work with the Health Ministry to prepare a letter of guarantee for the hospital providing the medical care;

    g. the hospitals bill the Health Ministry directly;

    h. the Health Ministry pays the hospital with funds provided by the Kuwaiti government;

    i. all payments for medical care are paid with funds from the Health Ministry's bank account;

    l. the Health Ministry's bank account is funded each month with a wire transfer from the Government of Kuwait;

    m. the wire transfers typically range from $25 million to $30 million dollars each month, but additional funds can be wired depending on the number of people needing medical assistance or the number of people collecting stipends;

    n. the Health Ministry maintains a bank account at a Bank of America branch located in the Van Ness neighborhood of Washington, D.C.;

    o. Health Ministry employees are paid by check from the Health Ministry's Bank of America bank account;

    p. SI-1 was originally hired to work at the Health Ministry as an accountant and was later tasked by Al Sharaf with conducting an audit of the Health Ministry's expenses;

q. during SI-1's audit, SI-1 noticed the Health Ministry's computerized accounting system allowed users to manually edit information associated with previous transactions to include a patient's name, the date of a payment, the payee's information and the amount of money paid;

r. SI-1 was concerned that individuals with access to the accounting system could conceal embezzlement activity by manipulating the information associated with the transactions;

s. SI-1 reported SI-1's concerns to a Senior Health Ministry official and Al Sharaf;

t. Al Sharaf subsequently hired another accountant known referred to as Unindicted Co-Conspirator 1 (herein referred to as UCC-1);

u. prior to the hiring of UCC-1, Health Ministry checks were maintained in a central location in order to prevent unauthorized payments from being made;

v. UCC-1 removed the controls on the Health Ministry checks;

w. in 2014, numerous accusations were made that Al Sharaf and UCC-1 were involved in embezzlement activity;

x. UCC-1 admitted in a written statement and orally to SI-1 to conspiring with others, including Al Sharaf, to embezzle money from the Health Ministry;

y. UCC-1 wrote a written statement in which UCC-1 admitted to embezzling funds with Al Sharaf and others from the Health Ministry and gave a copy of the written statement to S-1;

z. SI-1 witnessed Unindicted Co-Conspirator 2 (herein referred to as UCC-2) prepare a written statement in which UCC-2 stated UCC-2 had knowledge of UCC-1 operating UPMC, Hopiken and Med Star—the shell companies.

aa. Al Sharaf instructed SI-1 to call UCC-1 from his cell phone while in the Health Ministry Office, located in Washington, D.C., and in this phone conversation Sharaf asked UCC-1 for "the documents."

13. At the conclusion of the interview on November 3, 2014, SI-1 provided me with several documents, many of which were written in Arabic. One of the documents was a written statement dated September 17, 2014 which appeared to be signed by UCC-1. One of the documents was a written statement dated September 12, 2014 which appeared to be signed by

6

UCC-2, a Health Ministry employee. One of the documents was a written statement dated September 22, 2014 which appeared to be signed by Unindicted Co-Conspirator 3 (herein referred to as UCC-3), a Health Ministry employee.

14. On February 26, 2015, SI-1 correctly identified photographs of Al Sharaf, UCC-1, and UCC-2.

B. INFORMATION CONTAINED IN THE STATEMENT OF UCC-1

15. On November 7, 2014, I requested translators assigned to the U.S. Citizenship and Immigration Services Language Services Section translate the various documents previously provided by SI-1. On December 17, 2014, I received certified translations of the documents. The document previously identified as the written statement of UCC-1 stated in sum and in substance:

   a. UCC-1 had previously entered into an agreement with Al Sharaf to leave the Health Ministry so UCC-1 could open a business that would provide the Health Ministry with medicines;

   b. Al Sharaf advised UCC-1 that UCC-1 could sell medicines while continuing to work at the Health Ministry;

   c. Al Sharaf told UCC-1 they (UCC-1 and Al Sharaf) could split any profits equally;

   d. Al Sharaf wanted to make sure her name was not mentioned in any transactions so her involvement would not be known to third parties;

   e. UCC-1 was directed by Al Sharaf to prepare invoices for services that were not provided and to issue checks in the name of third parties;

   f. Al Sharaf wanted UCC-1 to provide her with $2 million dollars through the embezzlement scheme;

   g. UCC-1 and Al Sharaf agreed Al Sharaf would receive $1 million in cash;

   h. UCC-1 and Al Sharaf agreed to establish shell companies and to create fictitious bills from the shell companies to the Health Ministry;

7

i. UCC-1 and Al Sharaf that agreed even though bills would be sent to the Health Ministry, no actual services would be provided;

j. UCC-1 was not afraid of getting in trouble because UCC-1's partner in the scheme was UCC-1's superior;

k. the first shell company (MedStar) received approximately $200,000.00 in payments from the Health Ministry;

l. the second shell company (Hopiken) received approximately $300,000.00 in payments from the Health Ministry;

m. the third shell company (BMC, known to law enforcement as UPMC) received approximately $400,000.000 in payments from the Health Ministry;

n. Al Sharaf went on vacation in September 2014;

o. when Al Sharaf returned from her vacation, she wanted to know who signed the checks in her absence, to which UCC-1 replied a Senior Health Ministry official,

p. UCC-1 asked Al Sharaf how she wanted her money, to which Al Sharaf replied she would tell UCC-1 later;

q. later that week, Al Sharaf asked for copies of checks signed by a Senior Health Ministry official;

r. UCC-1 later learned employees of the Health Ministry were under investigation by the Kuwaiti government for embezzlement;

s. Al Sharaf tried to insinuate UCC-1 implicated her (Al Sharaf) in the embezzlement scheme;

t. a committee from the Kuwaiti government arrived to investigate the embezzlement;

u. UCC-1 went to a Senior Health Ministry official and confessed to UCC-1's and Al Sharaf's involvement in the embezzlement scheme;

w. Al Sharaf directed other Health Ministry employees to attempt to conceal her involvement in the scheme by changing payment information.

C. INFORMATION CONTAINED IN THE STATEMENT OF UCC-2

16. On November 7, 2014, I reviewed a document previously identified as the written statement of UCC-2 dated September 12, 2014. The document stated in sum and in substance:

a. UCC-2 was previously employed at the Health Ministry in 2014;

8

b. UCC-2 obtained UCC-2's position at the Health Ministry through UCC-1;

c. UCC-1 showed UCC-2 how to create fake invoices and how to steal money using the "KT" system (known to law enforcement as the Health Ministry's accounting system);

d. UCC-1 stated that UCC-1 created companies with names similar to companies that provided legitimate services to the Health Ministry;

e. on Monday, September 8, 2014 at approximately 10:00 AM, Al Sharaf came to UCC-2's desk and instructed UCC-2 to call UCC-1 on UCC-2's cellular telephone;

f. UCC-2 placed a call to UCC-1 and handed UCC-2's phone to Al Sharaf;

g. Al Sharaf told UCC-2 that she wanted UCC-2 to serve as a witness for the duration of the phone call;

h. Al Sharaf told UCC-1 to close the "deal" peacefully;

i. Al Sharaf threatened to call the Embassy and the State Department if UCC-1 didn't get "the stuff;"

j. Al Sharaf stated to UCC-2 that UCC-1 made a mistake at work and that she was trying to help UCC-1 fix the mistake by returning money;

k. UCC-2 believed Al Sharaf was trying to hide something;

l. UCC-2 then spoke with UCC-1, who stated UCC-1 would return the checks, but that most of the checks had already been cashed;

m. UCC-1 stated UCC-1 previously had an arrangement with Al Sharaf and that UCC-1 and Al Sharaf previously negotiated percentages and methods by which Al Sharaf would receive money from UCC-1;

n. UCC-1 provided UCC-2 with 8 checks made out to one or more shell companies that had been previously signed;

o. UCC-2 took a picture of a check without UCC-1 noticing;

p. on Tuesday, September 9, 2014, UCC-2 provided the checks to Al Sharaf who instructed UCC-2 to deposit the checks;

q. Al Sharaf stated she wanted to resolve this matter without anybody asking any questions;

    r. UCC-2 identified UPMC Global Services Inc, MedStar Physician LLC and Hopiken Medical LLC as companies owned and operated by UCC-1.

### D. INFORMATION CONTAINED IN THE STATEMENT UCC-3

17. On November 7, 2014, I reviewed a translation of a document previously identified as the written statement of UCC-3 dated September 22, 2014. The document stated in sum and in substance:

    a. UCC-3 worked at the Kuwait Health Ministry;

    b. UCC-3 learned from UCC-1 last February (2014) that UCC-1 told Al Sharaf that UCC-1 intended to submit UCC-1's resignation in order to open a company that would provide medicine to the Health Ministry;

    c. UCC-1 entered into an agreement with Al Sharaf in writing;

    d. the arrangement was prepared in writing, but the documents were subsequently torn;

    e. UCC-3 observed UCC-1 provide Al Sharaf with financial documents;

### E. IDENTIFICATON OF SHELL COMPANIES INVOLVED IN POSSIBLE EMBEZZLMENT ACTIVITY

18. On December 10, 2014, I conducted a search of the Virginia State Corporation Commission's (SCC) online database. A search for UPMC Global Services revealed a record for UPMC Global Care LLC with SCC identification number S5143021. Records checks revealed UPMC Global Care LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as July 9, 2014. The principal office is a residence located in Stafford, Virginia. The registered agent is listed as UCC-2.

19. A search for Hopiken Medical in the Virginia SCC online database revealed a record for Hopiken Medical Service INT LLC with SCC identification number S5231164. Records checks revealed Hopiken Medical Service INT LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as September 9, 2014.

The principal office is a residence located in Lorton, Virginia. The registered agent is listed as an individual who is known to the government as Unindicted Co-Conspirator 4 (herein referred to as UCC-4).

20. On February 19, 2015, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database. A search for UPMC Global Services revealed a record for UPMC Global Service LLC with department identification number W16035115. Records checks revealed UPMC Global Service LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as August 18, 2014. The principal office is a residence located in Silver Spring, Maryland. The registered agent is listed as an individual who is known to the government as Unindicted Co-Conspirator 5 (herein referred to as UCC-5).

21. A search for Hopiken Medical revealed a record for Hopiken Medical Service, LLC with department identification number W15759335. Records checks revealed Hopiken Medical Service, LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as March 20, 2014. The principal office is located in Baltimore, Maryland. The registered agent is listed as an individual who is known to the government as Unindicted Co-Conspirator 6 (herein referred to as UCC-6). A review of the Articles of Incorporation indicates Hopiken Medical Service LLC was formed to provide medical transportation services.

F. REVIEW OF BANK RECORDS ASSOCIATED WITH BANK OF AMERICA ACCOUNT NUMBER XXXXXX0454

22. On December 15, 2014, I subpoenaed bank records associated with Bank of America bank account number XXXXXX0454. Bank of America bank account number XXXXXX0454 is identified as being associated with the Kuwait Health Office, Embassy of Kuwait. A review

of records associated with the account revealed the Health Ministry was located at 4301 Connecticut Avenue, NW, Suite 300 in Washington, D.C. a Senior Health Ministry official and Hanan Sharaf (Deputy Health Attaché for Finance) were identified as signatories on the account.

23. SI-1 has stated that UCC-1, UCC-2, and UCC-3 were employed by the Health Ministry. A review of the checks issued from the Health Ministry's bank account corroborates that fact, as checks are issued to these individuals.

24. A review of checks authorizing payment from the Health Ministry's bank account revealed payments to the following entities:

  d. Med Star Physician LLC – Baltimore, Maryland

  e. UPMC Global Service – Baltimore, Maryland

  f. Hopiken Medical Services – Baltimore, Maryland

25. A review of payments originating from the Health Ministry's bank account to established health care providers revealed payments to Johns Hopkins Medicine, MedStar and UPMC Global Care. A review of the address information associated with these payments indicates Johns Hopkins Medicine, MedStar and UPMC Global Care are established entities that provide legitimate medical services.

26. Checks issued by the Kuwait Health Ministry were deposited in accounts controlled by the shell companies. The following list contains a sample of payments made from the Kuwaiti Health Ministry to accounts controlled by the shell companies during the conspiracy:

| HEALTH MINISTRY CHECKS DEPOSITED INTO SHELL ACCOUNTS | | | |
|---|---|---|---|
| Date (On or About) | Account Holder | Bank | Amount |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $8,766.40 |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $9,074.60 |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $9,140.70 |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $9,993.85 |
| 3/13/14 | Hopiken Medical Services | Wells Fargo | $12,657.00 |

| 4/8/14 | Hopiken Medical Services | Wells Fargo | $13,375.62 |
| 4/8/14 | Hopiken Medical Services | Wells Fargo | $11,375.62 |
| 4/8/14 | Hopiken Medical Services | Wells Fargo | $9,860.62 |
| 8/8/14 | Hopiken Medical Services | Wells Fargo | $57,483.25 |
| 8/8/14 | Hopiken Medical Services | Wells Fargo | $53,483.25 |
| 8/9/14 | Hopiken Medical Services | Wells Fargo | $59,483.25 |

## VI. CONCLUSION

27. Based on the above described facts, there is probable cause to believe that Al Sharaf knowingly conspired with other individuals employed by the Kuwaiti Health Ministry in Washington, D.C. as well as other individuals to violate of Title 18, United States Code, Section 1956(h). Specifically, Al Sharaf and other individuals knowingly conducted financial transactions with property representing the proceeds of the specified unlawful activities of bank fraud (18 U.S.C. § 1344(2)) and wire fraud (18 U.S.C. § 1343) knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity in violation of 1956(a)(1)(B)(i) and that the criminally derived property involved in each was of a value greater than $10,000 and was derived from specified unlawful activity in violation of 18 U.S.C. § 1957. Furthermore, there is probable cause to believe that Al Sharaf was paid a portion of the funds in cash in, all in violation of Title 18, United States Code, Section 1956(h).

        Brendan M. Shelley, Special Agent
        U.S. Department of Homeland Security
        U.S. Immigration and Customs Enforcement
        Homeland Security Investigations

Sworn to and subscribed to before me
this_____ day of March, 2015