IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | )<br>)<br>) |
| v. | ) Crim. No. 1:15-MJ-139 (GMH)<br>) |
| **HANAN AL SHARAF** | )<br>)<br>) |

**MOTION TO DISMISS THE CRIMINAL COMPLAINT ON THE GROUNDS OF
DIPLOMATIC IMMUNITY AND MEMORANDUM OF LAW IN SUPPORT**

Defendant, Hanan Al Sharaf, by and through her undersigned counsel, hereby submits her Motion to Dismiss the Criminal Complaint on the Grounds of Diplomatic Immunity and Memorandum of Law in Support thereof and requests that this Court dismiss this case pursuant to 22 U.S.C. § 254d.

**I.      Introduction**

The defendant, Hanan Al Sharaf, has diplomatic immunity in this case.  Accordingly, the Court lacks jurisdiction over her and the complaint in this case should be dismissed.   22 U.S.C. § 254d ; Rule 12 (b)(2), *Fed. R. Crim. P.*  Ms. Al Sharaf is a Kuwaiti citizen who was assigned to the United States by her government to work in the Kuwait Health Office in Washington, D.C. While preforming her duties and responsibilities in that Office, she had diplomatic status. Compl. ¶4.  The criminal complaint concerns actions allegedly undertaken by Ms. Al Sharaf while preforming her functions in the Health Office.  As prior decisions of this and other courts have recognized, where the complaint concerns "acts performed by such a person in the exercise of [her] functions as a member of the [diplomatic] mission" the "defendant's immunity remains intact."  *Knab v. Republic of Geor.*, No. 97-cv-3118, 1998 WL 34067108, at *4 (D.D.C. May 29, 1998)( *quoting* the Vienna Convention on Diplomatic Relations ("VCDR"), which the United

States has ratified). *See also De Luca v. United Nations Org.*, 841 F.Supp. 531 (S.D.N.Y. 1994) (dismissing complaint brought against former officials of the United Nations, citing the VCDR). Accordingly, Ms. Al Sharaf is entitled to immunity from prosecution here in the United States, the Court lacks jurisdiction over her and the complaint should be dismissed.

## II. Factual Background

Ms. Al Sharaf has been employed by the Kuwait Health Ministry since 2000. In July 2011, after eleven years of service, the Ministry assigned Ms. Al Sharaf to Washington, D.C. as the Financial Attaché to the Kuwait Health Office.

The Kuwait Health Office (the "Office") in Washington, D.C is an official Kuwait government office maintained by the Kuwait Ministry of Health. Compl. ¶ 5. The function of the Office is to coordinate medical treatment for Kuwaiti citizens who wish to come to the United States for treatment. *Id.* at ¶ 6. As described in the criminal complaint, the Health Office pays for health care expenses incurred by Kuwaiti nationals receiving medical treatment in the United States. *Id.* The Health Office processes the payment to the treatment providers and also provides an allowance to Kuwaiti citizens traveling to the United States for such treatment to cover their travel and lodging expenses. *Id.*

The Health Office employed a staff of accountants that is responsible for (1) reviewing the claims for payment from medical providers (hospitals, doctors, etc.) and processing such claims for payment; and (2) reviewing and processing the patient allowances provided to the Kuwaiti citizens coming here for treatment. *See* Compl. ¶ 6. Ms. Al Sharaf, along with the Director of the Health Office, were authorized to review and approve these payments. *Id.* ¶ 7.[1]

---

[1] Ms. Al Sharaf had other duties and responsibilities in the Health Office, including negotiation of discounted rates with health care providers; making recommendations to improve the efficiency of the Office such as by upgrading the computer payment system; and preparing

2

As a Kuwaiti citizen assigned here by her government, Ms. Al Sharaf was provided a Kuwait diplomatic passport and U.S. visa that confirmed that she had diplomatic status. *Id.* at ¶ 4. She moved here in 2011 with her four children, who attend local schools. She lives in McLean, Virginia. Her husband works for another agency of the Kuwait government and is currently working in Kuwait.

### III. The Criminal Complaint

The criminal complaint alleges that from February to October 2014, Ms. Al Sharaf and others in the Health Office engaged in a scheme to embezzle money from the Health Office involving the issuance of checks drawn on the Office's bank account payable to purported medical treatment providers that were really phony shell companies and disbursements from the shell companies' accounts to the accounts of members of the conspiracy. *Id.* at ¶¶ 2, 9. The complaint does not connect Ms. Al Sharaf to the establishment of these shell companies as all are registered in the names of other unindicted co-conspirators. *Id.* at ¶ 18-21. The complaint charges this scheme as a conspiracy to commit money laundering (18 U.S.C. § 1956(h)) involving specified unlawful activities consisting of bank fraud and wire fraud (18 U.S.C. §§ 1344(2) and 1343). *Id.* at ¶ 2.

Ms. Al Sharaf denies any participation in this scheme and in fact maintains that she was the whistle-blower who reported it to the Health Ministry in September 2014 when she learned of the checks to the shell companies. This declaration of whistle-blower status is substantiated by two letters sent by Ms. Al Sharaf on September 9 and 19, 2014. In the letters, attached as Exhibits 1 and 2 with English translations, Ms. Al Sharaf wrote to Dr. Al-Wetaib, the Director of the Health Office, and copied two senior officials in Kuwait, the Kuwaiti Undersecretary of the

---

budgets and monthly reports of the expenses of the Health Office, which she sent back to the Health Ministry in Kuwait.

3

Ministry of Health and the Kuwaiti Assistant Undersecretary for Financial Affairs of the Ministry.  *See* Exhibits 1 and 2.  The subject line on the first letter revealed Ms. Al Sharaf's reporting of the embezzlement, bluntly stating: "Request to investigate suspected financial misconduct."  Exhibit 1.  On September 19, 2014, Ms. Al Sharaf again wrote to the same officials and stated that the Office must employ "those of sufficient experience, capability and required honesty" for the benefit of the Office.  Exhibit 2.  As a result of her report, the Kuwait Ministry of Health commenced an investigation into the embezzlement in the Health Office.

However, this Motion does not ask the Court to decide whether Ms. Al Sharaf was in fact a whistle-blower or the factual question of her guilt or innocence.  Rather the issue to be decided is whether Ms. Al Sharaf's alleged conduct was performed "in the exercise of her functions as a member of the mission" and is thus immune from prosecution under the VCDR.  As discussed in more detail in Section IV below, the answer is that immunity does apply here and therefore the Court lacks jurisdiction over her and the complaint should be dismissed.

As a result of Ms. Al Sharaf's reporting of the embezzlement to the Health Ministry, the Ministry sent a committee to Washington to investigate the matter further.  Compl. at ¶ 15(r)-(t).  In November, 2014 the Ministry re-assigned both Ms. Al Sharaf and the Director of the Office back to Kuwait.  Because Ms. Al Sharaf's young children (ages 6, 10, 15 and 17) were in the middle of their school year, Ms. Al Sharaf requested and was granted a delay in returning to Kuwait until the end of the current school year.  She remains an employee of the Health Ministry but is no longer working in the Health Office.  Because she was no longer working in the Office, her diplomatic status expired in December 2014 and she no longer has a current diplomatic passport or diplomatic credentials.  *Id*. at ¶ 4.

On March 5, 2015, Ms. Al Sharaf was departing from Dulles International Airport traveling to Kuwait for a week to visit her husband and attend to some business there when she was detained and subsequently arrested by agents from the Department of Homeland Security. Although alleged by the government at the bail hearing that Ms. Al Sharaf's plane ticket was a one-way ticket, the ticket was in fact a roundtrip ticket that included a return to the United States on March 13, 2015. Exhibit 3. At the Preliminary Hearing on June 1, 2015, the agent who arrested Ms. Al Sharaf admitted that she had a return ticket at the time of her arrest and that he was mistaken in his belief that she had only a one-way ticket. Ms. Al Sharaf was subsequently released on bond with electronic monitoring and surrender of her passport. In order for her attorney to discuss the case with the government, Ms. Al Sharaf twice waived her right to have a Preliminary Hearing within 21 days of her initial appearance. The Preliminary Hearing was ultimately held on June 1-3, 2015, following which the Magistrate Judge found probable cause. The government has recently issued a request for legal assistance to the government of Kuwait and obtained an exclusion from speedy trial deadlines while this request is pending. *See* Order Granting Appl. Exc. Time, May 20, 2015, ECF No. 26. Ms. Al Sharaf now formally moves this Court to dismiss the complaint on the ground that it is barred by diplomatic immunity.

IV. **A Foreign National with Diplomatic Status is Immune From Prosecution for Alleged Acts Performed in the Exercise of Her Functions as a Member of a Foreign Mission**

The United States and Kuwait are both parties to the Vienna Convention on Diplomatic Relations ("VCDR"), which was ratified by the United States in 1972. *See* April 18, 1961, 23 U.S.T. 3227 (entered into force in U.S. Dec. 13, 1972).[2] The VCDR provides varying degrees of

---

[2] A copy of the VCDR is attached as Exhibit 4.

immunity from civil and criminal legal processes to members of a diplomatic mission.[3] An individual who is a current member of a diplomatic mission (a "diplomatic agent") is immune from the criminal jurisdiction of the receiving state. VCDR, art. 31(1); Ex. 4 at 9. Within certain narrow exceptions, such persons are also immune from the civil jurisdiction of the receiving state. *Id.* The VCDR makes clear that "every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post." VCDR, art. 39 (1) ; Ex. 4 at 12. Article 39 also contains the following subsection, which is particularly applicable here:

> [w]hen the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in the case of armed conflict. *However with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.*

VCDR, art. 39(2); Ex. 4 at 12. This immunity exists even after the diplomatic function has ended because "[t]he acts of a diplomatic agent in the exercise of his official functions are in law the acts of the sending State. It has therefore always been the case that the diplomat cannot <u>at any time</u> be sued in respect of such acts since this would be indirectly to implead the sending State." *Boanan v. Baja*, 627 F. Supp. 2d 155, 162 (S.D.N.Y 2009) (emphasis added) (citing Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 439 (3d ed. 2008)); *see also Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d Cir. 2010) (referring to a former diplomat's immunity and stating the "purpose of immunizing a diplomatic agent's private acts is to ensure the efficient functioning of a diplomatic mission . . .").

---

[3] The VCDR uses the term "mission" rather than the term "embassy." The "members of the mission" are the head of the mission and the members of the staff of the mission. VCDR, art. 1.

In accordance with the VCDR and to safeguard diplomatic protections, Congress enacted the Diplomatic Relations Act of 1978, which mandates that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed." 22 U.S.C. § 254d. As explained below, this provision mandates the dismissal of the complaint in this case.

> a. <u>Ms. Al Sharaf Is Entitled to Diplomatic Immunity Because the Complaint Pertains to Acts She Allegedly Performed in the Exercise of Her Function as a Member of the Kuwait Diplomatic Mission.</u>

The Complaint acknowledges that Ms. Al Sharaf had diplomatic status in connection with her position with the Kuwait Health Office. Specifically, it alleges that she entered the United States in July 2011 on an A-2 Non-Immigrant Visa and in January 2014 on an A-1 Non-Immigrant Visa. Compl. ¶4. According to information on the Department of State website, these visas are reserved for diplomats and other officials working at a foreign embassy and full-time employees of the foreign government assigned to work at the foreign embassy and perform duties there. *See* Exhibit 5 (obtained at http://travel.state.gov/content/visas/english/other/diplomat-foreign-government-official.html). The complaint alleges that her diplomatic status terminated on or about December 10, 2014, which is after the period in which the alleged conspiracy occurred (*i.e.*, the February to October 2014 period). Compl. ¶¶ 2, 4. Thus, it is beyond dispute that Ms. Al Sharaf had diplomatic status at the time of the alleged conspiracy. Furthermore, even if her formal diplomatic status ended in December 2014, under the provision of VCDR, Article 39 quoted above, "with respect to acts performed by [her] in the exercise of [her] functions as a member of the mission, [her] immunity shall continue to subsist." S*ee Knab v. Republic of Geor.*, No. 97-cv-3118, 1998 WL 34067108, at *4 (D.D.C. May 29, 1998). *Knab* involved a suit against a former diplomat who

engaged in drunk driving that resulted in the death of another person. The court held that immunity applied because the former diplomat's immunity from civil prosecution "remain[ed] intact for acts performed in the exercise of his duties as a diplomatic officer" pursuant to Article 39 of the VCDR and there was no issue of whether the act was performed outside of those duties. 1998 WL 34067108, at *4.

In analyzing whether the act or acts at issue were performed by the person in the exercise of her functions as a member of the mission, "the court must do so without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010).[4] Further, "[i]f the rule were otherwise, routine allegations of wrongful conduct or improper motive would defeat the immunity and the solid protection that Congress intended to afford international organizations and their officials would indeed be evanescent." *Brzak v. United Nations*, 551 F. Supp. 2d 313, 320 (S.D.N.Y. 2008) (internal citations omitted).

In *Brzak*, employees claimed employment discrimination and retaliation against former high-ranking officials of the United Nations. *Id*. at 315-16. Because they were former officials, the court analyzed whether the suit related to "acts performed by the Individual Defendants in their official capacity." *Id*. at 320. The court concluded that the allegations of "sexual harassment and 'indecent battery' against [defendant] are allegations of abuse of authority in the workplace. Whether [defendant's] alleged acts were intended or perceived as sexual in nature may be relevant to their wrongfulness, but not to the determination of functional immunity." *Id*. The court found that the defendants have immunity under the VCDR and under the International

---

[4] The *Brzak* court also cited parallel objective tests for other forms of immunity, "[f]or instance, a prosecutor is immune from suit under 42 U.S.C. § 1982. In applying that functional test, we have looked to the objective acts of the prosecutor in question, not to the type of injury alleged. *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)." *Brzak*, 597 F.3d at 114 n. **.

Organizations Immunities Act, § 7(a), 22 U.S.C. § 288d(b), which has a parallel functional immunity clause.  Thus, even though the allegations, if true, would have constituted an abuse of the former official's employment responsibilities, the court still found immunity applied.

In *De Luca v. United Nations Org.*, the plaintiff made the following allegations against a former diplomat, including that he: (1) issued a forged and fraudulent pay statement; (2) denied him extended medical coverage; (3) failed to respond to plaintiff's complaints; and (4) manufactured a fraudulent 1987 tax audit and intended to retaliate against the plaintiff for his complaints.  841 F.Supp. 531, 533 (S.D.N.Y. 1994).  The defendant at the time of the allegations had diplomatic status, the alleged bad acts occurred while he was engaged in his work duties while in his diplomatic office, and during his daily activities of issuing payment to employees. *Id.*  The court held pursuant to Article 39 of the VCDR that "[n]otwithstanding how improper any of these actions may have been, they represent precisely the type of official activity" that should be deemed immune.  *Id.*; *compare with Boanan*, 627 F. Supp. 2d at 165-66, 170 (holding former diplomats did not have immunity from former domestic servants' claims of forced labor, human trafficking, and involuntary servitude when "entirely peripheral to [diplomat's] official duties as a diplomatic agent.") (internal citations omitted).

Similarly, the allegations in the instant complaint pertain solely to Ms. Al Sharaf's acts and decisions while performing her functions as the Financial Attaché to the Health Ministry. The complaint alleges that in the course of her duties to approve payments to health care providers, Ms. Al Sharaf also knowingly approved fraudulent payments to shell companies that were not real providers, thereby diverting money to the shell companies' accounts and ultimately to the alleged co-conspirators.  *See* Compl. ¶¶ 9-17.  Similar to *De Luca*, Ms. Al Sharaf was employed by a foreign government at the time of the alleged acts; she had diplomatic status at

the time that these acts allegedly occurred; and the alleged acts are alleged to have occurred while performing her duties within the foreign government office in Washington, D.C. Therefore, as in *De Luca* and *Brzak*, immunity applies to these allegations. In analyzing the allegations and the applicability of the immunity conferred by the VCDR, "the court must do so without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak*, 597 F.3d at 113. Therefore, whether Ms. Al Sharaf approved *fraudulent* payments and did so *knowingly* is relevant to her potential criminal liability, "but not to the determination of functional immunity." *See Brzak,* 551 F.Supp. 2d at 320.

### V. Conclusion

Because the allegations contained in the complaint objectively relate to the official functions that Ms. Al Sharaf exercised during her employment as the Financial Attaché for the Kuwait Health Office while she had diplomatic status, Ms. Al Sharaf has immunity from prosecution for the actions alleged in the complaint. Accordingly, the complaint should be dismissed pursuant to 22 U.S.C. § 254d.

Dated:  July 1, 2015

                                                 Respectfully submitted,

                                                 /s/
                                     Terence J. Lynam (No. 253872)
                                     Stanley E. Woodward, Jr. (No. 997320)
                                     AKIN GUMP STRAUSS HAUER & FELD LLP
                                     1333 New Hampshire Avenue, N.W.
                                     Washington, DC  20036
                                     (202) 887-4000 (telephone)
                                     (202) 887-4288 (facsimile)
                                     Email: tlynam@akingump.com
                                     sewoodward@akingump.com

                                     *Counsel for Hanan Al Sharaf*

## CERTIFICATE OF SERVICE

I certify that on this 1st day of July, 2015, I have served a copy of the foregoing document electronically and/or by placing a copy of the same in the U.S. Mail addressed as follows:

> Marie Dalton, Esq.
> Stephen A. Gibbons, Esq.
> United States Department of Justice
> Asset Forfeiture and Money Laundering
> 1400 New York Avenue, N.W., Suite 500
> Washington, DC  20005

>                /s/
> Terence J. Lynam (No. 253872)
> AKIN GUMP STRAUSS HAUER & FELD, LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, D.C.  20036
> (202) 887-4000 (telephone)
> (202) 887-4288 (facsimile)
> Email: tlynam@akingump.com
>
> *Counsel for Hanan Al Sharaf*