## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | **)** |
|  | **)** |
|  | **)**  Crim. No. 1:15-MJ-139 (GMH) |
| **v.** | **)** |
|  | **)** |
| **HANAN AL SHARAF** | **)** |
|  | **)** |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

Charged with conspiracy to commit money laundering in connection with the embezzlement of up to two million dollars from the Kuwait Embassy Health Office, Defendant Hanan Al Sharaf ("the Defendant") now moves to dismiss the criminal complaint on the grounds that she is immune from prosecution pursuant to the Vienna Convention on Diplomatic Relations ("VCDR").  In so doing, the Court is presented with two questions: (1) whether the Defendant, herself, can invoke the doctrine of immunity; and (2) *if* the Defendant can, whether the conduct alleged in the complaint was undertaken in the exercise of her official functions as a diplomatic officer and therefore falls within the residual immunity covering her prior official functions.  The law is clear.  The Defendant may not rely on immunity to avoid prosecution in this case.

The Defendant's motion to dismiss the criminal complaint misunderstands the concept of immunity and its operation as a matter of law.  Under both U.S. and international law, immunity belongs to the state, not to the individual official.  Its assertion is a matter of sovereign discretion for the state.  The Defendant makes no argument that the State of Kuwait is seeking to assert that the acts were its acts and as such should benefit from immunity here, even though the State of Kuwait knows of this prosecution.  The Defendant cannot by herself successfully assert that she

1

enjoys immunity.  The Defendant's argument that she benefits from residual immunity, which she, herself, asserts with respect to the actions alleged in the criminal complaint therefore fails.

Further, even assuming that the question of immunity *were* at issue, the criminal acts alleged in the complaint—which include conspiring to establish shell companies, to prepare fraudulent invoices issued by the shell companies, to deposit checks from the Kuwait Embassy Health Office into the shell companies' accounts, to accept cash payments from the stolen funds, and to redeposit a portion of stolen funds into the Health Office account in order to conceal the embezzlement—are not "official conduct" for which the Defendant would benefit from residual immunity under the VCDR.  As set forth herein, the Defendant is not entitled to residual immunity for the conduct outlined in the criminal complaint because: (1) the Defendant's conduct bore no relationship to her official duties as Finance Attaché; (2) the Defendant's conduct was not related to the functions of Kuwait's diplomatic mission; and (3) the Defendant's actions were not undertaken in the course of implementing an official policy or program and are not imputable to the State of Kuwait.  The Defendant and her co-conspirators acted to enrich themselves at the expense of the Kuwait Embassy Health Office and she should not be permitted to misuse the concept of immunity to avoid prosecution.

For all these reasons, the Defendant's motion to dismiss the criminal complaint on the grounds of immunity should be denied.

## STATEMENT OF FACTS

I.      **Defendant's Status While in the United States**

The Defendant is a citizen of Kuwait who formerly served as a diplomatic agent at the Embassy of Kuwait in the United States.  Specifically, from approximately August 10, 2011 through December 9, 2014, she served as the Finance Attaché at the Kuwait Embassy Health

2

Office at the Embassy of Kuwait in Washington, D.C.  *See* Letter from the Assistant Chief of

Protocol Gladys Boluda at the United States Department of State, dated March 16, 2015

("Boluda Letter") (attached hereto as Exhibit A).  The Defendant was terminated from her

position at the Kuwait Embassy on or about December 9, 2014.  *Id.*  The Defendant remained in

the United States and was arrested on March 5, 2015, nearly three months after her termination.

DN 4, Arrest Warrant.

## II.     The Criminal Charge

On March 5, 2015, the Defendant was charged by criminal complaint with conspiring to

commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.

As alleged in the complaint, during her tenure as Finance Attaché, the Defendant conspired with

others to embezzle up to two million dollars from the Kuwait Embassy Health Office.  In

furtherance of the conspiracy, the Defendant: (1) agreed to establish shell companies in the

United States using names that resembled legitimate U.S. healthcare providers so they would go

undetected; (2) directed others to prepare invoices from the shell companies for services that

were not provided; (3) directed others to issue checks from the Health Office's U.S. bank

account to the shell companies; (4) instructed others to provide her with cash payments from the

stolen funds; (5) directed others to conceal her involvement in the embezzlement by changing

payment information in the Health Office accounting system; and (6) instructed others to

redeposit a portion of the stolen funds into the Health Office account in order to conceal the

theft.  DN 1, Complaint ¶¶ 15-16.

## APPLICABLE LAW

**III.    Immunity Under the Vienna Convention on Diplomatic Relations**

**A.   Vienna Convention on Diplomatic Relations**

The Vienna Convention on Diplomatic Relations is an international treaty that sets forth, *inter alia*, the privileges and immunities to be accorded to diplomatic agents and other diplomatic mission staff.  *See* The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 28 U.S.T. 3227, T.I.A.S. 7502, 500 U.N.T.S. 95.  A treaty is "primarily a compact between independent nations."  *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)).  Immunity is intended for the benefit of the sovereign, not the individual officials on whose behalf immunity may be asserted.  *See generally Breard v. Greene*, 523 U.S. 371, 378 (1998).  A "diplomatic agent" is the term for ambassadors and other diplomatic officers who generally have the function of dealing directly with host country officials.  *See* U.S. Dep't of State, Bureau of Diplomatic Security, Diplomatic and Consular Immunity, Guidance for Law Enf't and Judicial Auths., Dep't of State Publ'n 150546 at 7 (2015) ("State Department Guidance") (attached hereto as Exhibit B).

When properly asserted, the protections of immunity under the VCDR are given full effect under U.S. law by Title 22, United States Code, Section 254d, which provides that:

> [a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . or under any other laws extending diplomatic privileges and immunities, shall be dismissed.  Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure.

22 U.S.C. § 254d.  This section "makes pellucid that American courts must dismiss a suit against anyone who is entitled to immunity under either the VCDR or other laws 'extending diplomatic privileges and immunities.'"  *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010).

4

In evaluating a motion to dismiss pursuant to Section 254d, the court must determine whether the acts charged in the criminal complaint constitute acts that would be immune from prosecution. *See United States v. Khobragade*, 15 F. Supp. 3d 383, 388 (S.D.N.Y. 2014). In so doing, the court must consider the allegations in the complaint to be true "without judging whether the underlying conduct actually occurred." *Brzak*, 597 F.3d at 113. Additionally, some courts in the Second Circuit have held that a court must not consider whether the "defendants acted in bad faith or with improper motive" in "determin[ing] whether or not they are immune from the present action," but instead must conduct a functional analysis to determine whether immunity applies. *DeLuca v. United Nations Org.*, 841 F. Supp. 531, 535 (S.D.N.Y. 1994).[1]

## B. Residual Immunity

Under the VCDR, diplomats enjoy near absolute immunity from prosecution during the period of their assignment. *See* VCDR, Art. 31. Generally, during that time, "diplomatic officers may not be arrested, detained, prosecuted or sued unless their immunity is waived by the sending state." *Khobragade*, 15 F. Supp. 3d at 385. The purpose of such immunity "is not to

---

[1] Although the Defendant cites to a number of employment cases to suggest that the Court must only consider the functional acts committed by the former diplomat and not their intent, in cases involving tortious or criminal conduct courts do appear to have looked at the intent behind the conduct to determine whether residual immunity is applicable. For example, although the Second Circuit in *Swarna* cited to this standard, it then went on to conclude that "enduring rape . . . would not be part of [any mission-related] functions." *Swarna v. Al-Awadi*, 622 F.3d 123, 138 (2d Cir. 2010). In its opinion, the court necessarily accepted that the former diplomat acted with the intent necessary to commit the offense of rape. Similarly, in *Baoanan v. Baja*, the court found that the former diplomat's alleged conduct constituted private rather than official conduct, holding that "claims of human trafficking, involuntary servitude, and forced labor involve allegations of acts that were entirely peripheral to [Baja's] official duties as a diplomatic agent." 627 F. Supp. 2d 155, 170 (S.D.N.Y. 2009) (internal citations and quotations omitted). Again, these offenses involve intent elements, which the court appears to have incorporated into its analysis in finding the former diplomat was not entitled to immunity. The United States highlights this tension for the Court but, as set forth herein, urges that under either a functional standard or a standard where intent is considered the Defendant's conduct is not immunized under Article 39(2) of the VCDR.

5

benefit individuals but to ensure the efficient performance of the functions of diplomatic

missions as representing States."  VCDR, pmbl., cl. 4.  The Department of State has further

elaborated that, "foreign representatives may carry out their duties effectively only if they are

accorded a certain degree of insulation from the application of the laws of the host country.

Thus, these representatives need protection *while* they are serving in their positions so that they

may fully carry out their functions, without fear of interference or harassment by the receiving

state."  Declaration of the Legal Advisor of the U.S. Department of State, Abraham D. Sofaer,

dated July 5, 1988, at ¶ 6 (submitted in *United States v. Guinand*, 688 F. Supp. 774 (D.D.C.

1988)) (attached hereto as Exhibit C).

　　Although active diplomats enjoy broad immunity from prosecution pursuant to the

VCDR, former diplomats retain immunity only for their prior *official* acts.  *See* VCDR, Art.

39(2).  Specifically, Article 39(2) of the VCDR states:

> When the functions of a person enjoying privileges and immunities have come to
> an end, such privileges and immunities shall normally cease at the moment when
> he leaves the country, or on expiry of a reasonable period in which to do so, but
> shall subsist until that time, even in case of armed conflict.  However, with
> respect to acts performed by such a person *in the exercise of his functions as a
> member of the mission*, immunity shall continue to subsist.

VCDR, Art. 39(2) (emphasis added).  Article 39(2) provides for limited immunity to former

diplomatic officials, often referred to as "residual immunity."  This residual immunity:

> [I]s a less expansive immunity that remains with former diplomats for certain acts
> committed during their occupation of the diplomatic station.  Specifically, once a
> diplomat becomes a "former" diplomat, he or she is not immune from suit for
> prior acts unless those acts were performed "in the exercise of [the former
> diplomat's] functions as a member of the mission."

*Swarna*, 622 F.3d at 134 (quoting VCDR Art. 39(2)).

　　Article 39(2) of the VCDR provides that comprehensive immunity ceases "at the moment

when [the former diplomat] leaves the country, or on expiry of a reasonable period in which to

do so." A reasonable time for departure is "usually interpreted as thirty days." *Guinand*, 688 F.

Supp. at 774; Exhibit A, Boluda Letter at 1-2 ("Upon termination of duties, it is the practice of

the United States government to accord 30 days as the reasonable period for a member of the

mission to depart the United States unless another period is specified by the Department of

State"). The only immunity which remains is residual immunity for acts performed in the

exercise of the functions as a member of the mission. *Guinand*, 688 F. Supp. at 774.

## ARGUMENT

**IV.   The Court Should Deny the Defendant's Motion to Dismiss Because the Defendant Does Not Enjoy Immunity for the Crimes Charged**

### A.   The State of Kuwait Has Not Sought to Assert Immunity in this Case

The Defendant has failed to show any assertion by the State of Kuwait of immunity in

this case. The immunities provided by the VCDR are solely intended to facilitate diplomatic

relations between the states concerned and are not to benefit individuals to whom the treaty's

immunity provisions apply. Immunity which protects foreign officials for their official acts

ultimately belongs to the sovereign rather than the official. *See generally Breard v. Greene*, 523

U.S. at 378 (rights provided to foreign officials exist for the benefit of the country they represent

not themselves as individuals). The VCDR states expressly that "the purpose of such privileges

and immunities is not to benefit individuals but to ensure the efficient performance of the

functions of diplomatic missions as representing States." VCDR pmbl.; *see* Yoram Dinstein,

*Defences*, in 1 Substantive and Procedural Aspects of International Criminal Law 371, 386-88

(Gabrielle Kirk McDonald & Olivia Swaak-Goldman eds., 2000) (diplomatic immunity is not

personal to the diplomat but belongs to the diplomat's state); Eric C. Surette, Annotation,

*Applicability of Diplomatic Immunity Under Vienna Convention and Diplomatic Relations Act*, 1

A.L.R. Fed. 2d 351 § I, ¶ 2 (2005) ("Diplomatic immunity is not a privilege of the person, but of the state that a diplomatic represents.").

Accordingly, it is telling that the State of Kuwait, whose sovereign interests would be at stake if the acts were, as the Defendant claims, taken in the course of her official functions as a diplomat, has not sought to assert immunity. The State of Kuwait is fully aware of the prosecution as: (1) Special Agent Shelley has met with Kuwaiti investigators on this matter, *see* Exhibit D, Prelim. Hr'g Tr. 23:23-24:7; (2) a representative from the Embassy of Kuwait was in attendance at the Defendant's initial appearance on March 6, 2015 and also at the March 9, 2015 detention hearing; and (3) the United States transmitted a formal request for legal assistance to the State of Kuwait on May 19, 2015 seeking evidence relevant to this case. Accordingly, the only reasonable conclusion is that the State of Kuwait, like the United States, does not consider the acts at issue to be official acts for which immunity can be properly asserted. Since the sovereign controls any immunity that may exist, it is not for a former employee to assume and assert this sovereign prerogative. It is within the sovereign's sole discretion whether to assert an individual's immunity from a foreign state's judicial process, if in fact any such immunity exists.[2] Absent such an assertion, the Defendant cannot establish "upon motion" that she is entitled to immunity, nor has the suggestion been made on her behalf. *See* 22 U.S.C. § 254d. As a result, she is subject to prosecution under the laws of the United States.

---

[2] The sovereign's ownership of immunity is reflected in the relationship between immunity and waiving immunity. Because diplomatic immunity exists for the benefit of the sovereign and not the diplomatic agent, it is well established that a state can waive immunity at its discretion. *See* VCDR art. 32(1) ("The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under article 37 may be waived by the sending State."); *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988); *Restatement (Third) of Foreign Relations Law of the United States* (1986) § 464, cmt. j.

**B.  Even Assuming that Immunity Were at Issue Here, as a Former Diplomat, the Defendant Enjoys Only Residual Immunity for Acts Taken in the Course of Her Diplomatic Functions**

The Defendant was arrested on March 5, 2014, almost three months after she was terminated from her position at the Kuwaiti Embassy.  As determined by the State Department, the Defendant's "entitlement to privileges and immunities under Article 31 of the VCDR concluded in early January [2015]," approximately 30 days after she was terminated from her position as an Attaché at the Embassy of Kuwait.  Exhibit A, Boluda Letter at 2.[3]  At the time of her arrest and this filing, the Defendant enjoyed no diplomatic status and benefitted only from residual immunity with respect to prior acts performed in the exercise of her functions as a member of the Kuwaiti Embassy.  For all other acts, the Defendant is subject to prosecution under the criminal laws of the United States.

**C.  Even Assuming that Immunity Were at Issue, the Acts Charged in the Complaint Are Not Acts Performed in the Exercise of the Defendant's Diplomatic Functions**

The acts giving rise to the charges in the criminal complaint were not performed in the Defendant's exercise of her official functions as the Finance Attaché for the Kuwait Embassy Health Office.  First, the conduct forming the basis of the criminal complaint was not in the course of the Defendant's diplomatic functions as Finance Attaché.  Second, the Defendant's

---

[3]  "The Court must accept the State Department's determination that Defendants have diplomatic status."  *Montuya v. Chedid*, 779 F. Supp. 2d 60, 62 (D.D.C. 2011).  "A court's reliance on the State Department's certification when determining diplomatic immunity has a long history in this country's jurisprudence."  *United States v. Kuznetsov*, 442 F. Supp. 2d 102, 106 (S.D.N.Y. 2006).  As far back as 1890, the Supreme Court stated that "the certificate of the secretary of state . . . is the best evidence to prove the diplomatic character of a person."  *In re Baiz*, 135 U.S. 403, 421 (1890).  Indeed, "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status."  *Abdulaziz v. Metro. Dade Cty.*, 741 F.2d 1328, 1331 (11th Cir. 1984); *see also Kuznetsov*, 442 F. Supp. 2d at 107 (observing that "[c]ourts have continued to find that recognition and certification by the State Department is necessary to establish diplomatic immunity").

conduct was not related to the functions of a diplomatic mission.  And finally, the Defendant's

actions were not undertaken in the course of implementing an official policy or program and are

thus not imputable to the State of Kuwait.

### 1. The Charged Conduct Was Not in the Course of the Defendant's Diplomatic Functions

As the Finance Attaché at the Kuwait Embassy Health Office, the Defendant's duties did

not include the conduct outlined in the complaint.  As alleged in the complaint: (1) "UCC-1 and

the Defendant agreed to establish shell companies and to create fictitious bills [issued] from the

shell companies to the Health Ministry," DN 1, Complaint ¶ 15(d); (2) shell companies were

incorporated in Virginia and Maryland, with names that closely resembled legitimate health care

providers,[4] *id.* at ¶¶ 18-21; (3) Al-Sharaf "directed" UCC-1 "to prepare invoices for services that

were not provided and to issue checks in the name of third parties," *id.* at ¶ 15(e); (4) bank

accounts were opened in the name of the shell companies, and checks issued by the Kuwait

Embassy Health Office were deposited into those accounts, *id.* at ¶ 26; and (5) the Defendant

"agreed [that she] would receive $1 million in cash" from the embezzled funds, *id.* at ¶ 15(h).

Additionally, Special Agent Shelley stated during the preliminary hearing that, on at least one

occasion, the Defendant accepted a bag of cash from a co-conspirator, containing between

$5,000 and $10,000.  *See* Exhibit D, Prelim. Hr'g Tr. 11:3-13:12.  The Complaint further alleged

that, upon discovery of the embezzlement, the Defendant instructed her co-conspirators to

---

[4] As alleged in the complaint, the Defendant agreed to create these companies and, as a member of the conspiracy, "[s]he becomes responsible for the acts of [her] co-conspirators in pursuit of their common plot." *Smith v. United States*, 133 S. Ct. 714 (2013) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

redeposit a portion of the funds previously issued to the shell companies back into the Kuwait

Embassy Health Office bank account.  DN 1, Compl. ¶ 16(h)-(r).

As Finance Attaché for the Kuwait Embassy Health Office, the Defendant's duties did

not include incorporating shell companies, creating invoices to be issued by shell companies,

opening bank accounts for shell companies, depositing checks into shell companies' bank

accounts, distributing funds from these bank accounts to co-conspirators, accepting portions of

the stolen funds in cash payments—including by accepting a bag of cash from a co-conspirator—

or obtaining checks from shell companies and redepositing those funds into the Health Office's

account.  These actions in no way benefitted the Health Office, the Kuwait Government, nor the

Kuwaiti people.  These were entirely private acts neither implicated nor required as part of the

Defendant's duties as Finance Attaché.  Accordingly, the actions outlined in the complaint were

not carried out "in the exercise of [the Defendant's] functions as a member of the mission," but

instead were entirely private acts carried out for personal profit.  VCDR, Art. 39(2).

Residual immunity does not extend to "private acts" or to acts that are "entirely

peripheral to the diplomatic agent's official duties."  *Swarna v. Al-Awadi*, 607 F. Supp. 2d 509,

518 (S.D.N.Y. 2009), *aff'd in part, vacated on other grounds, and remanded by Swarna v. Al-

Awadi*, 622 F.3d 123 (2d Cir. 2010).  Instead, residual immunity only applies to "acts performed

in the exercise of [the former diplomat's] duties as a diplomatic officer."  *Knab v. Republic of

Georgia*, No. 97 CV 3118, 1998 WL 34067108, at *4 (D.D.C. May 29, 1998).  The acts alleged

in the complaint were separate and distinct from the Defendant's official functions, and were not

necessary or incidental to her responsibilities as Finance Attaché.[5]  In evaluating residual

---

[5] The fact that the initial conspiracy was hatched and the subsequent distribution of stolen funds
was undertaken, in part, in the Kuwait Embassy Health Office, does not render those actions

immunity under Article 39(2), the Court should consider the character of the acts alleged in the complaint, and conclude that they were private actions of the Defendant for which she enjoys no residual immunity.

**2. The Defendant's Conduct Was Not Related to the Functions of a Diplomatic Mission**

The Defendant is also not entitled to residual immunity as her actions bore no relationship to the "functions of a diplomatic mission" listed in Article 3 of the VCDR.  Article 3 "provides a list of the functions of a diplomatic mission, to inform an analysis of whether an act was performed in the exercise of a former diplomat's functions as a member of the mission." *Baoanan*, 627 F. Supp. 2d at 163.  Article 3 provides that:

> The functions of a diplomatic mission consist *inter alia* in:
> a.  representing the sending State in the receiving State;
> b.  protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;
> c.  negotiating with the Government of the receiving State;
> d.  ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;
> e.  promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

Indisputably, the Defendant's actions were not undertaken in order to "[p]rotec[t] in the receiving State the interests of the sending State and of its nationals."  VCDR, Art. 3(1)(b).  Far from protecting the State of Kuwait, the Defendant's actions resulted in the theft of over $1.3 million designated for the medical treatment and expenses incurred by Kuwaiti citizens in the United States.  *See United States v. Walid Aly Ahmed Salem Aly,* No. 1:15-mj-160 (D.D.C. Mar. 27, 2015) at DN 1, Compl. ¶ 12; *see also* DN 1, Compl. ¶ 11.[6]  Additionally, the act of

---

"official conduct."  To do so would "improperly reward form over substance."  *Baoanan,* 627 F. Supp. 2d at 169.

[6] The Affidavit in Support of a Criminal Complaint and Arrest Warrant filed in this case states that as of the date of filing, March 5, 2015, investigators had discovered "at least $250,000 was

conspiring to steal from the Kuwait Embassy Health Office was not undertaken to represent Kuwait, VCDR, Art. 3(1)(a); to negotiate with the U.S. government, *id.* at Art. 3(1)(c); to ascertain and report on conditions and developments in the United States, *id.* at Art. 3(1)(d); or to promote friendly relations between the United States and Kuwait. *Id.* at Art. 3(1)(e).

Consistent with the language in Article 3(b), courts have evaluated whether the foreign mission benefitted from the acts of its former diplomat in determining whether those acts should be considered official conduct. For example, in *Swarna*, the Second Circuit held that "while *residual* diplomatic immunity applies to the 'acts performed by such a person in the exercise of his functions as a member of the mission,' Vienna Convention art. 39(2), it does not apply to actions that pertain to his household or personal life and that may provide, at best, 'an indirect' rather than a 'direct . . . benefit to' diplomatic functions." 622 F.3d at 134-35 (internal citation omitted). Similarly, in *Baoanan*, the court concluded that the act of hiring a domestic servant was not an official act, as her services "did not benefit the Philippine Mission itself, except tangentially, but rather inured predominantly to the [former diplomat's] private needs." 627 F. Supp. 2d at 169-70.

As alleged in the Complaint, the Defendant's conduct undermined the mission of the Embassy of Kuwait and its Health Office. Not only did the Embassy of Kuwait and its Health Office not derive even "tangential" benefits from the Defendant's alleged actions, but the Health Office was manifestly harmed by the embezzlement. The only ones who benefitted from the embezzlement scheme were its perpetrators, the Defendant and her co-conspirators. Under these

---

paid by the Health Ministry to the shell companies." In the Affidavit in Support of a Criminal Complaint and Arrest Warrant filed approximately two weeks later against one of Defendant's co-conspirators, Walid Aly Ahmed Salem Aly, this figure was revised to $1.3 million based on the discovery of additional payments.

circumstances, to immunize the Defendant's conduct would be contrary to the purpose of immunity, which "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  VCDR, pmbl., cl. 4.  Accordingly, the Court should conclude that the Defendant's actions are not the type of conduct that Article 39(2) of the VCDR was intended to immunize.

### 3.   The Defendant's Actions Were Not Undertaken In the Course of Implementing an Official Policy or Program and are Not Imputable to the State of Kuwait

Additionally, the Defendant's conduct is not immunized under Article 39(2) because she did not undertake the actions alleged in the complaint in the course of "implementing an official policy or program of the [Kuwait Embassy Health Office]."  *Swarna*, 607 F. Supp. 2d at 517; *see also DeLuca*, 841 F. Supp. at 531 (holding that "actions which defendants have taken in implementing U.N. employment and financial policy" were immunized under Article 39(2)).  Instead, they were purely private acts that did not represent the mission of the Kuwait Embassy Health Office and were not completed at the direction or request of the State of Kuwait.  As the Second Circuit held, official acts entitled to residual immunity include "only such acts as are directly imputable to the state or inextricably tied to a diplomat's professional activities."  *Swarna*, 622 F.3d at 135.  This is because "[t]he immunity of a diplomatic agent for his official acts . . . is not a personal immunity of the diplomatic agent but is in reality the immunity of the sending sovereign state."  *Id.* (quoting SATOW'S DIPLOMATIC PRACTICE 131 (Desmond Pakenham, ed., 5th rev. ed. 1979)).

A leading scholar on immunity explained that residual immunity for official acts is required because "[t]he acts of a diplomatic agent in the exercise of his official functions are in law the acts of the sending State."  Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 439 (3d ed. 2008) (hereinafter "Denza").  In other words,

"[c]ontinuing immunity . . . applies only to acts performed on behalf of or imputable to the sending State." *Id.* at 441.  As one court concluded, "residual diplomatic immunity applies to official acts—because such acts are attributable to the Sending State—but does not apply to private acts" that do not further the official polices of the foreign mission.  *Swarna*, 607 F. Supp. 2d at 509.

There is no basis for concluding that the Defendant's alleged conduct was "performed on behalf of or [was] imputable to the sending State."  Denza at 439.  The State of Kuwait through the Kuwait Embassy Health Office was a victim of the Defendant's conduct, suffering losses of over $1.3 million.  *See United States v. Walid Aly Ahmed Salem Aly,* No. 1:15-mj-160 (D.D.C. Mar. 27, 2015) at DN 1, Complaint ¶ 12; *see also* DN 1, Complaint ¶ 11.  To suggest that the Defendant's conduct can be imputed to the Health Office, and that her embezzlement should in law be considered to be the acts of the State of Kuwait, is difficult to fathom.  As Special Agent Shelley testified to at the preliminary hearing, the State of Kuwait is supportive of the Defendant's prosecution, terminated her from the Kuwait Embassy Health Office due to her misconduct, and seeks to recover funds stolen from the Office through this criminal prosecution. Exhibit D, Prelim. Hr'g Tr. 9:22-10:15, 23:23-24:7; *see also* DN 27, Mot. to Modify Conditions of Release ¶ 7 (indicating that the State of Kuwait has articulated specific concerns to the United States about the potential dissipation or concealment of assets that may be used for restitution). Under these circumstances, where the State of Kuwait, through its Embassy is a victim of the former diplomat's actions, the acts simply cannot be "performed in furtherance of h[er] diplomatic functions such that they are in law the acts of the sending State are official acts." *Baoanan*, 627 F. Supp. 2d at 164 (internal citation and quotations omitted).

### D.  The Cases Relied Upon by the Defendant are Distinguishable

In contending that the she is immune for prosecution, the Defendant relies primarily on employment discrimination cases, an area that courts have consistently held "lie[s] at the core of an international organization's immunity," which involve vastly different circumstances than those alleged in the criminal complaint.  *Brzak v. United Nations*, 551 F. Supp. 2d 313, 319 (S.D.N.Y. 2008), *aff'd by Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010); *DeLuca v. United Nations Org.*, 841 F. Supp. 531, 535 (S.D.N.Y. 1994).  In *Brzak*, for example, the court dismissed a suit brought against U.N. officials claiming that certain former officials committed employment discrimination and sexual harassment.  *Brzak*, 597 F.3d at 107.  The Defendant also relies upon *DeLuca*, in which the court found that certain former officials were immune from civil prosecution for claims that they, among other things, failed to pay an employee's salary and compensatory time, failed to reimburse withheld taxes, reported information to the I.R.S. related to the employee's tax withholdings, denied an employee extended health coverage, and forged an employee signature on a final pay statement.  841 F. Supp. at 531.

The plaintiffs in these employment-related cases raise challenges to the methods by which foreign missions supervise and direct employees in the workplace.  *See, e.g., Brzak*, 597 F.3d at 113 ("These allegations involve personnel management decisions falling within the ambit of the defendants' professional responsibilities").  As the D.C. Circuit has held, courts have consistently found that former officials of international organizations are immune from employment related suits initiated by employees of the international organization because:

> [T]he purpose of immunity from employee actions is rooted in the need to protect international organizations from unilateral control by a member nation over the activities of the international organization within its territory.  The sheer difficulty of administering multiple employment practices in each area in which an organization operates suggests that the purposes of an organization could be greatly hampered if it could be subjected to suit by its employees worldwide.

*Mendaro v. World Bank*, 717 F.2d 610, 615-16 (D.C. Cir. 1983) (quoted by *DeLuca*, 841 F. Supp. at 535-536).[7]

In contrast, the criminal complaint in this case does not involve an employment action. Instead, it alleges that the Defendant committed a crime, carried out for her own personal profit, contrary to the interests of her mission, by undertaking acts that are separate and distinct from her official duties. As a result, the facts of this case more closely approximate those at issue in *United States v. Guinand*. 688 F. Supp. 774 (D.D.C. 1998) In that case, the defendant was an employee of a foreign embassy at the time he allegedly entered into a narcotics transaction with an undercover law enforcement agent. *Id.* at 774. Like the Defendant in the present action, the defendant in *Guinand* committed a criminal act, motivated by personal gain, that was not related or incidental to his official duties, and could not be imputed to his sending state. In that case, the defendant was indicted on charges of distributing cocaine, and the foreign embassy terminated his employment, giving him a period of time within which to depart the United States. *Id.* Instead, the defendant remained in the United States, married an American citizen, and obtained permanent resident alien status. *Id.* The defendant moved to dismiss the indictment under the provisions of Title 22, United States Code, Section 254d, and the court denied the motion, holding that he was not immune from prosecution. *Id.* at 777.

---

[7] The Defendant's reliance on *Knab,* 1998 WL 34067108, is also misplaced. In *Knab*, the plaintiff sued a former diplomat for wrongful death and personal injuries, resulting from a traffic accident caused by a diplomatic official. *Id.* at *1. The court recognized that the only applicable immunity that might bar the prosecution was the residual immunity provided by Article 39. *Id.* at *4. However, the plaintiff had previously conceded to the court that the defendant had been acting in his official capacity at the time of the accident. *Id.* As a result, the court held that "there is no reason to suppose that this accident lies outside the protection of defendant's residual immunity." *Id.* Thus, the *Knab* court did not independently analyze whether Article 39's residual diplomatic immunity barred the prosecution of the former diplomat.

Cases brought by private domestic servants against their former diplomat employers are also instructive.  For example, in *Swarna*, the Second Circuit held that a domestic worker *could* sue her employer, a former diplomat at the Permanent Mission of the State of Kuwait to the United Nations, for subjecting her to slavery, involuntary servitude, forced labor, sexual abuse, breach of contract, and wage violations.  622 F.3d at 139.  In so doing, the Second Circuit affirmed the earlier decision of the district court, denying the defendants' motion to dismiss on the grounds of diplomatic immunity.  *Id.* (affirming in part, vacating on other grounds, and remanding).

In *Swarna*, the district court held that "because Mr. Al-Awadi's alleged acts of trafficking, involuntary servitude, enslavement, forced labor, rape and sexual slavery were private acts, not official acts, Mr. Al–Awadi has no residual diplomatic immunity" from prosecution.  607 F. Supp. 2d at 522.  The district court further held that the former diplomat's "alleged acts of fraudulently inducing plaintiff to work for him, failing to pay her minimum wage, and breaching their employment contract were not 'performed . . . in the exercise of his functions as a member of the mission,' and, thus, no residual diplomatic immunity bars plaintiff's labor law claims."  *Id.* at 520.  In affirming the district court's decision, the Second Circuit concluded that the domestic servant's "work for the family may not be considered part of any mission-related functions" and "surely enduring rape would not be part of those functions either."  622 F.3d at 138.

Similarly, in *Baoanan*, the court held that a former diplomat was not entitled to residual immunity for tortious claims brought by his domestic servant.  627 F. Supp. 2d at 155.  In finding that the former diplomat's alleged conduct constituted private rather than official conduct, the court held that "claims of human trafficking, involuntary servitude, and forced labor

involve allegations of acts that were entirely peripheral to [Baja's] official duties as a diplomatic agent." *Id.* at 170 (internal citations and quotations omitted).

In the present case, the complaint alleges that the Defendant engaged in conduct more analogous to the conduct at issue in *Guinand*, *Baoanan*, and *Swarna* than the employment-related conduct alleged in *DeLuca* and *Brzak*.  In *Guinand*, *Baoanan*, and *Swarna* the plaintiffs alleged that former diplomats committed tortious or criminal acts motivated by personal benefit, which is similar to the private, profit-motivated actions at issue in the instant case.  As in *Guinand*, *Baoanan*, and *Swarna*, the Defendant's alleged conduct bore no relationship to her official duties, was not related to the functions of her diplomatic mission, was not undertaken in the course of implementing an official policy or program, and was private conduct motivated by personal gain.

In light of the foregoing, the United States respectfully requests that *if* the Court determines that the Defendant may properly raise the issue of immunity (which she cannot), it should nonetheless hold that her alleged acts were not performed in the exercise of her official functions as the Finance Attaché for the Kuwait Embassy Health Office.  Thus, they are not entitled to residual immunity under Article 39(2) of the VCDR.

## CONCLUSION

Accordingly, for all the foregoing reasons, the United States respectfully submits that the Defendant's motion to dismiss the criminal complaint should be denied.

Respectfully submitted,

KENDALL DAY, ACTING CHIEF
ASSET FORFEITURE AND MONEY
   LAUNDERING SECTION


By:      */s/ Marie Dalton*_____
            MARIE DALTON (C.A. BAR 246606)
            Trial Attorney
            STEPHEN A. GIBBONS (D.C. BAR 493719)
            Trial Attorney
            Asset Forfeiture and Money
              Laundering Section
            United States Department of Justice
            1400 New York Avenue, NW
            Bond Building, Suite 10100
            Washington, DC  20005
            Telephone:   (202) 598-2982
                       (202) 598-2523
            Email:       marie.dalton@usdoj.gov
                       stephen.gibbons@usdoj.gov