**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　v.<br><br>HANAN AL SHARAF,<br><br>　　　　　　　Defendant. | Criminal No. 15-mj-139 (BAH) |

**<u>MEMORANDUM OPINION</u>**

The government filed a criminal complaint, on March 5, 2015, charging defendant Hanan

Al Sharaf, a former Financial Attaché assigned to the Kuwaiti Embassy in Washington, D.C.,

with conspiracy to money launder, in violation of 18 U.S.C. § 1956(h).  *See* Crim. Compl., ECF

No. 1 at 1; *id.*, Aff. in Support of Crim. Compl. and Arrest Warrant ("Shelley Aff."), ¶ 2.

Pending before the Court is the defendant's motion to dismiss the criminal complaint on the

ground of residual diplomatic immunity under the Diplomatic Relations Act of 1978, 22 U.S.C. §

254d.  *See* Def.'s Mot. to Dismiss the Crim. Compl. on the Grounds of Diplomatic Immunity and

Memo. of Law in Support ("Def.'s Mem."), ECF No. 34 at 1.  For the reasons explained below,

the defendant's motion to dismiss the criminal complaint is denied.[1]

**I.　　BACKGROUND**

The defendant served as the Financial Attaché to the Kuwait Health Office, an office

maintained by the Kuwait Health Ministry, in Washington, D.C. from approximately August 10,

2011 until December 9, 2014.  Shelley Aff. ¶ 4; Def.'s Mem. at 2.  She first entered the United

States in July 2011 under an A-2 Non-Immigrant Visa and, again, in January 2014 under an A-1

Non-Immigrant Visa.  Shelley Aff. ¶ 4.  According to the United States Department of State, A-1

---

[1]　　This case was initially assigned to the former Chief Judge and, on his retirement, was subsequently re-assigned, on March 24, 2016, to the undersigned Chief Judge.

and A-2 visas are only available to those persons "traveling to the United States on behalf of [their] national government[s] to engage solely in official activities for that government." Def.'s Mem., Ex. 5 ("State Dept's Visas for Diplomats and Foreign Government Officials") at 1, ECF No. 34-6.

The Kuwait Health Ministry's mission in Washington D.C. is to "pay for health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States." Shelley Aff. ¶ 6. The defendant's core responsibilities as the Financial Attaché to the Kuwait Health Office was to "review[] claims for payment from medical providers, process[] claims for payment [to medical providers], and personally approv[e] such payments." Report and Recommendation ("R&R") at 10, ECF No. 49; Def.'s Resp. Gov't's R&R Obj. ("Def.'s R&R Resp."), ECF No. 53 at 3; Gov't's Mot. Opp'n, Ex. D ("Prelim. Hrg. Tr.") at 23, ECF No. 38-4. To perform her duties, the defendant was a signatory on the Health Ministry's bank accounts. Shelley Aff. ¶ 23.

On March 5, 2015, the government filed a criminal complaint against the defendant, charging her, under 18 U.S.C. § 1956(h), with conspiracy to "knowingly conduct . . . financial transactions with . . . proceeds of . . . unlawful activities . . . knowing that the transactions were designed . . . to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity . . . and that the criminally derived property involved in each transaction as of a value greater than $10,000." Shelley Aff. ¶ 2. The government alleges that, first, the defendant conspired to "create shell companies, using names that closely resembled actual health care providers," in the States of Virginia and Maryland, and opened bank accounts in the name of these shell companies in U.S. banks in Maryland. *Id.* ¶¶ 9,

18–20, 24. [2]  Second, the defendant conspired to create fake medical invoices for unperformed medical services on behalf of the shell companies.  *Id.* ¶¶ 9, 15.  Third, the defendant conspired to pay the fake invoices by wiring funds, or issuing checks, from the Kuwait Health Ministry's bank account, opened in Washington, D.C., into the U.S. bank accounts controlled by the defendant in the names of the shell companies.  *Id.* ¶¶ 9, 12, 26.  Fourth, the defendant and the co-conspirators withdrew in cash the funds deposited by the Kuwait Health Ministry into the shell companies' U.S. Bank accounts.  *Id.* ¶¶ 9, 15.  Lastly, to conceal the embezzlement, the defendant allegedly directed her co-conspirators, who were her subordinates in the Kuwait Health Office, to edit transaction records associated with these unauthorized payments.  *Id.* ¶¶ 9, 15.  The defendant also allegedly accepted, in her office at the Kuwait Embassy in Washington, D.C., a bag containing between $5,000 and $10,000 in cash from a co-conspirator.  *See* Gov't's Mot. Opp'n at 10 (citing Prelim. Hrg. Tr. at 11:3–13:12).

On July 1, 2015, the defendant moved to dismiss the criminal complaint, *see* Def.'s Mem., which motion was referred to a Magistrate Judge for a Report and Recommendation, *See* Order Referring Case, ECF No. 47.[3]  On September 14, 2015, the Magistrate Judge recommended granting the defendant's motion and dismissing the criminal complaint, *see* R&R at 1, to which recommendation the government timely objected, *see* Gov't's Objections to the

---

[2]      The shell companies incorporated by the defendant and her co-conspirators were named "UPMC Global Services," "Hopiken Medical Services," and "Med Star Physician LLC," which closely resemble the names of the actual medical providers UPMC Global Care, John Hopkins Medicine and MedStar, respectively.  Shelley Aff. ¶ 25.
[3]      The defendant was arrested and brought before a Magistrate Judge on March 6, 2015, at which time the Magistrate Judge granted the government's motion for three-day temporary detention.  Minute Entry, dated March 6, 2015.  On March 9, 2015, the defendant was released on personal recognizance and placed into the High Intensity Supervision Program/Permanent Home Confinement.  Release to PSA's High Intensity Supervision Program, ECF No. 5.  Additionally, the defendant was ordered, *inter alia*, "to deposit into the registry of the Court a $100,000 cash bond," to surrender her passport and all other immigration documents, and prohibited from leaving the United States or entering or being within 10000 feet of any airport, embassy or consulate.  Conditions to Release on Bond at 1, ECF No. 5-1.  Her status has remained unchanged during the pendency of her motion to dismiss the criminal complaint.

Magistrate Judge's Proposed Findings and Recommendations Regarding Defendant's Motion to Dismiss ("Gov't R&R Obj."), ECF No. 51.  For the reasons set out below, the Report and Recommendation is rejected, and the defendant's motion is denied.

## II.   LEGAL STANDARD

### A.    Federal Rule of Criminal Procedure 59(b)

District court judges "may refer to a magistrate judge for recommendation" dispositive motions, such as a motion to dismiss or quash an indictment or information.  FED. R. CRIM. P. 59(b)(1).  Parties may file written objections to the magistrate judge's findings and recommendations "[w]ithin 14 days after being served with a copy of the recommended disposition."  FED. R. CRIM. P.  59(b)(2).  The magistrate judge's recommendation is subject to *de novo* review by the district court, which may "accept, reject, or modify the recommendation . . . ."  FED. R. CRIM. P. 59(b)(3); D.D.C. LOCAL CRIM. R. 59.2(c).

### B.    Federal Rule of Criminal Procedure 12(b)

Pursuant to Federal Rule of Criminal Procedure 12(b), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including a "motion that the court lacks jurisdiction."  FED. R. CRIM. P. 12(b)(1) & (2). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d

192, 196 (D.C. Cir. 1992)).  Absent subject matter jurisdiction over a case, the court must

dismiss it.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006).

　　"Federal courts have subject-matter jurisdiction over federal criminal prosecutions by

virtue of 18 U.S.C. § 3231, which vests the district courts with the power to hear 'all offenses

against the laws of the United States.'"  *United States v. Yousef*, 750 F.3d 254, 259 (2d Cir.

2014).  This jurisdiction is limited, however, by the Diplomatic Relations Act of 1978, codified

at 22 U.S.C. § 254 *et seq.,* which implements this country's treaty obligations under the Vienna

Convention on Diplomatic Relations ("VCDR").  Specifically, the Diplomatic Relations Act

provides that "[a]ny action or proceeding brought against an individual who is entitled to

immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic

Relations . . . or under any other laws extending diplomatic privileges and immunities shall be

dismissed."  22 U.S.C. § 254d.  A particular individual's immunity "may be established upon

motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or

applicable rules of procedure."  *Id.*  Under the VCDR, in turn, "a diplomat enjoys immunity from

the criminal jurisdiction of the host country," subject to certain restrictions.  *Aidi v. Yaron*, 672 F.

Supp. 514, 518 (D.D.C. 1987).

　　When considering a motion to dismiss for lack of jurisdiction, "a court assumes the truth

of th[e] factual allegations" contained in the criminal complaint.  *United States v. Ballestas*, 795

F.3d 138, 149 (D.C. Cir. 2015) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343

n.16 (1952)); *United States v. South Fla. Asphalt Co.*, 329 F.2d 860, 865 (5th Cir. 1964), *cert.*

*denied* 85 S. Ct. 149 (1964) ("On consideration of a motion to dismiss, all well pleaded facts are

taken to be true; and if the same constitute a criminal offense, the information is good and must

not be dismissed.").

## III.     DISCUSSION

The defendant contends that the criminal complaint against her should be dismissed because her actions are immune from criminal prosecution under the Diplomatic Relations Act, 22 U.S.C. § 254d.  *See* Def.'s Mem. at 1.  The government counters that diplomatic immunity does not apply to the charged actions because (1) the defendant lacks authority to assert diplomatic immunity on her own behalf and only the State of Kuwait may do so, *see* Gov't's Mot. Opp'n at 7, and (2) even if the defendant could personally assert diplomatic immunity, the "acts giving rise to the charges in the criminal complaint" are not covered by the VCDR, *id.* at 9. Since the defendant relies on the Diplomatic Relations Act, and, by incorporation, the VCDR, the legal framework of the VCDR is set out below, followed by discussion of each of the government's arguments that this law is no bar to prosecution.

### A.     The Vienna Convention on Diplomatic Relations

The VCDR, incorporated by reference in the Diplomatic Relations Act, is an international treaty that lays out "an international convention on diplomatic intercourse, privileges and immunities."  VCDR preamble, April 18, 1961, 23 U.S.T. 322, T.I.A.S. 7502.  The stated purpose of the VCDR is "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  *Id.*  Recognizing that "foreign representatives may carry out their duties effectively only if they are accorded a certain degree of insulation from the application of the laws of the host country," Gov't's Mot. Opp'n, Ex. C (Decl. of Legal Adviser of the Department of State, dated June 10, 1985) at 8, ECF No. 38-3, the VCDR provides, to all those entitled, diplomatic immunity "from criminal prosecution and protection from most civil and administrative actions," *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996); *see also* VCDR art. 31, ¶ 1 ("A diplomatic agent shall enjoy immunity from the

criminal jurisdiction of the receiving State.  He shall also enjoy immunity from its civil and

administrative jurisdiction[.]").[4]  Thus, the Diplomatic Relations Act "makes pellucid that

American Courts must dismiss a suit against anyone who is entitled to immunity under either the

VCDR or other laws 'extending diplomatic privileges and immunities.'"  *Brzak v. United*

*Nations*, 597 F.3d 107, 113 (2d Cir. 2010) (quoting 22 U.S.C. § 254d).

Consistent with the purpose of diplomatic immunity to facilitate the carrying out of a

diplomat's duties in representing a foreign nation, "diplomats lose much of their immunity

following the termination of their diplomatic status," or after a reasonable time for departure has

passed.  *Swarna v. Al-Awadi*, 622 F.3d 123, 133 (2d Cir. 201); VCDR art. 39, ¶ 2 ("When the

functions of a person enjoying privileges and immunities have come to an end, such privileges

and immunities shall normally cease at the moment when he leaves the country, or on expiry of a

reasonable period in which to do so . . . .").  "[S]ome form of residual immunity is necessary,"

*Baonan v.* Baja, 627 F. Sup. 2d 155, 162 (S.D.N.Y. 2009), however, for official acts performed

"in the exercise of [the former diplomat's] functions as a member of the mission," VCDR art. 39,

¶ 2.  These prior official functions constitute "in law the acts of the sending State."  *Baoanan*,

627 F. Supp. 2d at 162 (quoting EILEEN DENZA, DIPLOMATIC LAW: COMMENTARY ON THE

VIENNA CONVENTION ON DIPLOMATIC RELATIONS 439 (3d ed. 2008)).  To sue a former diplomat

for such official acts "would be indirectly to implead the sending state."  *Id.* (quoting same).

Consequently, a former diplomat, such as the defendant, whose appointment to the Kuwait

Embassy as a diplomat has ended, [5] is entitled only to the "less expansive immunity," *Swarna*,

---

[4]      Article 31, paragraph 1 of the VCDR provides three exceptions to civil immunity but those exceptions are
not relevant here because the defendant is facing criminal prosecution rather than a civil suit.

[5]      The defendant was terminated from her diplomatic position at the Embassy of Kuwait on December 9,
2014.  Shelley Aff. ¶ 4.  The criminal complaint was filed three months later, on March 5, 2015.  *See generally*
Crim. Compl.

622 F.3d at 134, that remains with former diplomats for "official functions" performed during her tenure.

### B.       The Defendant May Assert Residual Immunity on Her Own Behalf

The government initially disputed the defendant's right to assert her entitlement to immunity when the sending State, Kuwait, has not done so on her behalf.[6]  Gov't's Opp'n Mot. at 8.  In making this argument, the government relied on the preamble to the VCDR, which highlights that "'the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions at representing States.'" *Id.* at 7 (quoting VCDR preamble).  The government reasoned that residual immunity "ultimately belongs to the sovereign rather than the officials," *id.* (citing *Breard v. Greene*, 523 U.S. 371, 378 (1998)), and, therefore, the sending state has "sole discretion . . . to assert an individual's immunity from a foreign state's judicial process, if in fact any such immunity exists," *id.* at 8. The Magistrate Judge rejected this argument as "border[ing] on the frivolous," R&R at 6, and the government did not revive this point in its objections to the recommendation to dismiss the criminal complaint, *see generally* Gov't's R&R Obj.  Consequently, this argument may be deemed waived.  FED. R. CRIM. P. 59(b)(2) ("Failure to object . . . waives a party's right to review.").

In any event, to the extent that the government's objection to the R&R is intended to preserve this argument, the effort is unavailing.  The plain language of the Diplomatic Relations Act expressly states that diplomatic "immunity may be established upon motion or suggestion by . . . the individual," without any requirement of action by the sending State.  22 U.S.C. § 254d.

---

[6]      The government does not dispute that the defendant acquired full diplomatic immunity, as defined by the VCDR, for the period from August 10, 2011 to December 9, 2014, *see* Gov't's Opp'n Mot., Ex. 1 (Letter from Assistant Chief of Protocol of the U.S. Department of State regarding the diplomatic status of the defendant, dated March 16, 2015), ECF No. 38-1,

Moreover, the legislative history confirms that "an application for a dismissal of an action can be made by the diplomat himself." S. Rep. No. 95-958, at 5 (1978). The Department of State also interprets the VCDR to allow individual diplomats to assert immunity on their own behalves, *see* Gov't's Mot. Opp'n, Ex. B (State Department's "Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities") at 25–27 (enumerating the methods by which individuals may demonstrate entitlement to diplomatic immunity), ECF No. 38-2, and as the enforcing agency, this interpretation is granted "substantial deference," *United States v. Al-Hamdi*, 356 F.3d 564, 570 (4th Cir. 2004) (internal quotations and alteration omitted).

Indeed, the D.C. Circuit has held that "[i]t is enough that [the diplomat] has requested immunity, that the State Department has recognized that the person for whom it was requested is entitled to it, and that the Department's recognition has been communicated to the court." *Carrera v. Carrera*, 174 F. 2d 496, 497 (D.C. Cir. 1949); *see also Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 125 (D.D.C. 2009). The defendant in this case meets all of these conditions. She has requested immunity, *see generally* Def.'s Mem.; the State Department has recognized that she was a former diplomat entitled to privileges and immunities from August 10, 2011 to December 9, 2014, *see* Letter from Assistant Chief of Protocol of the U.S. Department of State regarding the diplomatic status of the defendant, dated March 16, 2015; and the State Department's recognition of her formal diplomatic status was communicated to the Court. Additionally, the record contains no indication that Kuwait has expressly waived the defendant's residual immunity, should it apply.

Accordingly, the defendant is entitled to assert diplomatic immunity notwithstanding that the sending State has not bolstered this assertion with any express statement of support.

### C.      The Charged Acts Are Not Protected by the Defendant's Residual Immunity

The defendant's assertion of diplomatic immunity rests on the residual immunity

provided in VCDR art. 39, ¶ 2, to former diplomats, which covers only "acts performed by such

a person in the exercise of his functions as a member of the mission."  VCDR art. 39, ¶ 2; Def.'s

Mem. at 6.  The government disputes that residual immunity applies here to bar the instant

prosecution because "[t]he acts giving rise to the charges in the criminal complaint were not

performed in the defendant's exercise of her official functions as the Financial Attaché for the

Kuwait Embassy Health Office."  Gov't Mot. Opp'n at 9.

Residual immunity applies only to actions that are "directly imputable to the state or

inextricably tied to a diplomat's professional activities," *Swarna*, 622 F.3d at 135, or actions that

"fall within the 'ambit' of the diplomatic agent's 'professional responsibilities,'" *Brzak*, 597 F.3d

at 113 (citations omitted).  "[A]cts that are 'incidental' to the exercise of his functions as a

member of the mission" are not protected.  *Swarna*, 622 F.3d at 134.  Consistent with the

Department of State's interpretation of VCDR art. 39, ¶ 2, "only 'official acts' and 'official

functions' were protected under Article 39(2)'s provision for residual immunity."  *Swarna*, 622

F.3d at 135 (citing Decl. of Legal Adviser of the Department of State, dated June 10, 1985).

To determine whether the charged acts are protected as an "exercise of [the defendant's]

functions as a member of the mission," the court "must not judge, 'whether the underlying

conduct actually occurred, or whether it was wrongful.'"  *Swarna*, 622 F.3d at 137 (quoting

*Brzak*, 597 F.3d at 113).  "Rather, our consideration is a functional one, which 'parallels the

objective tests we have adopted in applying other forms of immunity.'"  *Id.* (quoting *Brzak*, 597

F.3d at 113 n**).  As the defendant concedes, "whether the defendants enjoyed residual

immunity . . . depend[s] on whether the claims 'relate to' acts taken in the course of the

diplomat's official conduct, or instead whether the claims involve private conduct that was

'entirely peripheral' to those official functions," Def.'s R&R Resp. at 10 (citing *Swarna*, 607

F.2d at 518), and "'not on the nature of the underlying conduct,'" *id.* (quoting *Brzak*, 551 F.

Supp. 2d at 319).

Here, the criminal complaint charges the defendant with conspiracy to commit money

laundering, by conspiring to: (1) incorporate shell companies in Maryland and Virginia; (2) to

open bank accounts in Maryland "in the name of the shell companies;" (2) "create fictitious bills

issued from the shell companies to the [Kuwait] Health Ministry;" (3) "prepare invoices for

services that were not provided;" (4) "issue checks in the name of" the shell companies as

purported payment of the false invoices; (5) "receive $1 million in cash from the embezzled

funds;" and (6) "accept[] a bag of cash from a co-conspirator, containing between $5,000 and

$10,000." Gov't's Mot. Opp'n at 10 (internal quotation marks omitted).

The defendant describes these factual allegations as "all . . . allegedly carried out at the

diplomatic mission with other mission employees, and made possible because of her mission-

related functions." Def.'s Reply in Supp. of Def.'s Mot. to Dismiss the Criminal Compl. on the

Grounds of Diplomatic Immunity ("Def.'s Reply") at 6, ECF No. 45. As such, she contends that

these alleged actions are, "at a minimum, 'inextricably tied' to her 'professional activities,'"

which "'included overseeing a staff that reviewed claims for payment from medical providers,

processing claims for payment, and personally approving such payments.'" *Id.* (quoting Shelley

Aff. ¶¶ 6–7). More generally, the defendant urges the Court not to "parse the claim in search of

underlying acts that, if true, would be outside the scope of a diplomat's official functions."

Def.'s R&R Resp. at 13. Yet, this is the precise task before the Court: to scrutinize the charged

acts objectively and evaluate whether they fall within the defendant's official functions subject to her residual immunity.

The defendant, however, is not charged with stealing her employer's funds, to which she had authorized access by virtue of her position as the Financial Attaché to the Kuwait Health Office in the Kuwait Embassy.  To the contrary, a review of the charged acts demonstrates that the defendant is accused of executing a complex scheme designed to conceal the source of the embezzled funds by exploiting mechanisms provided under Maryland and Virginia law.  These charged acts plainly fall outside any sphere of the defendant's "exercise of [her] functions as a member of the mission."  VCDR art. 39, ¶ 2.[7]  The defendant's official responsibilities regarding the payment of U.S. medical bills of Kuwaiti citizens did not require, and were not furthered in any way, by (1) the incorporation of U.S. shell companies, let alone giving those shell companies names designed to mimic those of actual health care providers; (2) the opening of U.S. bank accounts on behalf of those U.S. shell companies; (3) the creation of fictitious bills from those shell companies; and (4) the distribution to her and co-conspirators of funds from the accounts of the shell companies.  *See* Shelley Aff. ¶¶ 9, 12, 15, 18-20, 24, 26.  Furthermore, other than the source of the funds being funneled through the U.S. shell companies and the associated bank accounts, none of these acts were undertaken "in the course of 'implementing an official policy or program" of, or to benefit, the State of Kuwait at all.  Gov't's Mot. Opp'n at 13–14 (quoting

---

[7]      Indeed, the State of Kuwait has denied that the charged acts were part of the defendant's "official duties." On September 21, 2015, the Department of State issued a diplomatic note requesting that Kuwait either "confirm that the acts listed in the attachment were **not** performed in the exercise of Ms. al Sharaf's functions as a diplomat at the Embassy of Kuwait," or, "if any of the alleged acts are considered by the government of Kuwait to be part of her official functions, the Department of State requests the government [to] waive any residual immunity to permit the criminal case to proceed against her."  United States' Notice of Suppl. Auth., Ex. 1 (Diplomatic Note Issued to the State of Kuwait, dated Sept. 21, 2015) at 1–2 (emphasis in original), ECF No. 52-1.  The State of Kuwait responded that "the activities set forth in the Attachment to the aforesaid Diplomatic Note [were] . . . not performed in connection with, or in the furtherance of, the duties or official functions of a diplomatic employee."  *Id.*, Ex. 2 (Kuwait's Response to the Diplomatic Note, dated Oct. 1, 2015) at 1, ECF No. 52-2.

*Swarna*, 607 F. Supp. 2d at 517).  In fact, assuming the charged facts to be true, as the Court

must, the defendant's conspiratorial actions caused harm to Kuwait, resulting in the theft of

"over $1.3 million designated for the medical treatment and expenses incurred by Kuwaiti

citizens in the United States."  *Id.* at 12.

The defendant argues that she is nonetheless entitled to immunity because the charged

acts were "allegedly carried out by Health Office employees who worked under Ms. Al Sharaf,"

and, therefore, "were inextricably tied to defendant's diplomatic duties," Def.'s R&R Resp. at

13–14.  She emphasizes that, even if these charged acts did not "fall into the ambit" of her

professional responsibilities, the "*core of the Defendant's acts*, as alleged in the complaint,

actually fell within the scope of the Defendant's official functions."  *Id*. at 13 (internal quotations

omitted; emphasis in original).  These arguments are unavailing.

### 1.    Defendant's Management Role Does Not Immunize Her Alleged Conduct

Ironically, the defendant seeks to use the allegation that her co-conspirators in the

charged money laundering scheme were her subordinates as a critical factual basis for assertion

of residual immunity.  Def.'s R&R Resp. at 13–14.  Merely because the defendant may have

engaged others with whom she worked in corrupt activities does not, however, cloak her actions

with the immunity intended to protect the exercise of her official functions.  To put it bluntly, the

defendant is not entitled to immunity for every act that she directed her subordinates to perform

when those acts are outside of the scope of her and her subordinates' official duties.

The defendant's reliance on *Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010) and *De

Luca v. United Nations Organization*, 841 F. Supp. 531 (S.D.N.Y. 1994), for her theory that the

defendant's position as a manager immunizes all of her activities with her subordinates, is

misplaced.  *See* Def.'s R&R Resp. at 14.  In both of these civil cases involving claims against the

United Nations ("UN") and current or former UN officials, the defendants were found to enjoy residual "functional immunity" for their treatment of the plaintiffs.  Contrary to the defendant's theory, however, these cases illustrate the circumscribed nature of the residual immunity afforded to employees for their conduct during their employment.

In *Brzak,* the plaintiffs alleged that, after one of the plaintiffs complained internally about a defendant former UN supervisor inappropriately touching her at a meeting, both plaintiffs, including a second supportive plaintiff, were subjected to "manipulat[ed]" work assignments and denied promotions, which actions the plaintiffs claimed amounted to sex discrimination under several federal statutory and state common law theories.  597 F.3d at 110.  The Second Circuit scrutinized the factual allegations underlying the claims regarding the defendants' alleged actions affecting "the conditions of her employment," including "changes of her work assignments" and "the defendants conduct in investigating [the plaintiff]'s claims," and found that "[t]hese allegations involve personnel management decisions falling within the ambit of the defendants' professional responsibilities" that were "relate[d] to the management of the office[.]" *Id*. at 113.  The Court therefore concluded that those claims predicated on "personnel management decisions" were barred under residual immunity, but expressly declined to opine about whether such functional immunity applied to the state law claim of battery, over which the Court declined to exercise supplemental jurisdiction after dismissal of the federal claims.  *Id.* at 113–14.

The factual allegations supporting the claims at issue in *Brzak* fell precisely within the scope of the defendants' official management duties and, even if those duties were exercised improperly or even illegally, the claims were barred.  By contrast, here, the defendant's alleged conduct of creating shell companies with associated bank accounts in order to conceal her

14

embezzlement of funds from her employer fall far outside her—and her subordinates'—official duties.

Likewise, the plaintiff in *De Luca* alleged that the UN and current and former UN officials unlawfully withheld his taxes and asserted claims "breach of contract, forgery, negligence and the violation of federal civil rights and employee medical benefits law."  841 F. Supp. at 532–33.  The underlying factual allegations against the former U.N. Secretary-General and the former Assistant Secretary-General, who were entitled to residual immunity under the VCDR, were based in their "fail[ure] to reimburse plaintiff for his 1988 taxes," "supervision of the U.N. office of Human Resources Management, which plaintiff asserts failed to respond to complaints he filed about the taxes," and "the creation of the 1987 tax audit that the plaintiff claims were intended to retaliate against the U.S"—all acts that were indisputably part of the former diplomats' official functions.  *Id.* at 534.  Consequently, the claims against these former UN officials were dismissed as barred under residual immunity.

Notably, the *De Luca* court expressly distinguished the nature of the factual allegations at issue from those in a criminal case where immunity under § 7(b) of the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288 *et seq.*,[8] was denied to a UN inventory clerk indicted on forty-four counts of grand larceny, since the alleged crimes involved thefts against his co-workers and these thefts were not "either 'directly or remotely related to the functions of his U.N. employment.'"  *Id.* at 535 (discussing *People v. Coumatos*, 224 N.Y.S.2d 504, 510 (Sup. Ct. 1961), *later opinion*, 224 N.Y.S.2d 507 (Sup. Ct. 1961), *aff'd mem.* 20 A.D.2d

---

[8]    Section 7(b) of the IOIA provides current U.N. officers and employees functional immunity similar to the residual immunity afforded to former diplomats under the VCDR.  *See* 22 U.S.C. § 288d(b) ("Representatives of foreign governments in or to international organizations and officers and employees of such organizations shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees . . . .").

850 (N.Y. App. Div. 1964)).  The *De Luca* court explained that "*Coumatos* is clearly inapposite as plaintiff's claims challenge actions which defendants have taken in implementing U.N. employment and financial policy."  *Id.*

The charged acts here may have occurred while the defendant had management responsibilities as part of her employment with the Kuwait Embassy, but that fact is not dispositive.  Rather, as the analyses in *Brzak* and *De Luca* make clear, the critical inquiry is whether the factual allegations underlying the claim describe conduct that is part of the defendant's official "management of the office."  *See also Swarna*, 622 F.3d at 139 (noting that *Brzak*, 597 F.3d at 114, left "open the question of whether a U.N. official's alleged commission of the tort of battery against a U.N. employee constituted activity outside the scope of residual immunity," and holding that residual immunity would apply "[o]nly if the commission of such crimes could be considered an official act"); *Jimenez v. Delgado*, 978 F. Supp. 2d 726, 731–32 (S.D. Tex. 2013) (barring, on the ground of consular immunity, the plaintiff's wrongful termination claims because "managing and supervising consular employees is a 'consular function'" and "terminating employees' employment or not renewing their employment contracts are acts 'performed in the exercise of' that function"); *Ford v. Clement*, 834 F. Supp. 72, 73, 75–76 (S.D.N.Y. 1993) (Sotomayor, D.J.), *aff'd without opinion*, 29 F.3d 621 (2d Cir. 1994), *cert. denied*, 115 S. Ct. 449 (1994) (finding consular immunity applies where the defendant was accused of engaging in "a campaign of harassment designed to force [the plaintiff] out of the Consulate," because the allegations implicate "the management and supervision of" the plaintiff, which "indeed lie at the core of any efforts by the [defendant] to perform [his] designated functions").[9]

---

[9]        *Jimenez v. Delgado* and *Ford v. Clement* rely on consular immunity under the Vienna Convention on Consular Relations, rather than residual immunity under the VCDR, but the reasoning of these courts is still

Here, the defendant avers that the scope of her managerial duties involved "overseeing a staff that reviewed claims for payment from medical providers, processing claims for payment, and personally approving such payments." Def.'s Reply at 6. Engaging personally, or directing her subordinates, to engage in conduct designed to conceal the embezzlement of their employer's funds is simply not related to reviewing or processing claims for payment from medical providers and does not entitle her to residual immunity under the guise of managing subordinates.

### 2.  Defendant's Official Responsibilities For Certain Funds Does Not Immunize All Conduct In Her Handling of Those Funds

The defendant also argues that her official responsibilities for processing medical claims payments should immunize any part of her conduct that involves handling these funds, even if the manner in which she did so was illegal. As the defendant puts it, she is immune from the charged crime because "*the core of the Defendant's acts*, as alleged in the complaint, actually fell within the scope of the Defendant's official functions." Def.'s R&R Resp. at 13 (internal quotations omitted). The defendant's argument is predicated on a misapprehension of the crime charged.

The criminal complaint charges the defendant with conspiracy, in violation of 18 U.S.C. § 1956(h), "to commit violations of 18 U.S.C. § 1956(a)(1)([B])(i) and 1957." Crim. Compl. at 1. The latter two criminal statutes, which are the alleged objects of the charged conspiracy,

---

persuasive because, as other courts have noted, consular immunity and residual diplomatic immunity are "virtually identical." *Rana v. Islam*, 305 F.R.D. 53, 60-61 (S.D.N.Y. 2015). Notably, article 43 of the Vienna Convention on Consular Relations, which provides consular immunity, is almost identical to article 39 of the VCDR. *Compare* Vienna Convention on Consular Relations art. 43, ¶ 1, April 24, 1963, 21 U.S.T. 77, T.I.A.S. 6820 ("Consular officers . . . shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State *in respect of acts performed in the exercise of consular functions*." (emphasis added)), *with* VCDR art. 39, ¶ 2 ("However, *with respect to acts performed by such a person in the exercise of his functions as a member of the mission*, immunity shall continue to subsist." (emphasis added)). Both immunities are functional immunities that require analysis of whether the charged acts were "performed in the exercise" of consular or diplomatic functions.

prohibit financial transactions "involv[ing] the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i), and "knowingly engag[ing] . . . in a monetary transaction in criminally derived property of a value of greater than $10,000 and is derived from specified unlawful activity, 18 U.S.C. § 1957.   In other words, the defendant is not charged with embezzlement from her employer of the medical claims' payments.  Instead, she is charged with conspiring to launder the ill-gotten funds by creating shell companies, opening bank accounts for the shell companies and withdrawing cash from those bank accounts to conceal the funds' source—precisely those charged acts that are not "inextricably tied" to her professional responsibilities.

The government acknowledges that central to the conspiracy charge is that "the Defendant used her position as the Financial Attaché for the Kuwait Health Office to facilitate criminal conduct."  Gov't's R&R Obj. at 3.  This acknowledgement, however, does not detract from the conclusion that the crucial charged acts that form the gravamen of the money laundering conspiracy objectively cannot be seen as an "exercise of [the defendant's functions as a member of the [diplomatic] mission," within the meaning of the Diplomatic Relations Act, 22 U.S.C. § 254d, and the VCDR art. 39, ¶ 2.  As another court has succinctly put it in the analogous context of consular immunity, "an act in furtherance of a conspiracy by a consular officer which takes advantage of the privileges of that position does not suddenly make it a consular function."  *United States v. Cole*, 717 F. Supp. 309, 322–23 (E.D. Pa. 1989).[10]  *See also*

---

[10]     The defendant attempts to distinguish from *Cole* on the ground that "*Cole* involved application of the Vienna Convention on *Consular* Relations, and 'differences exist in the scope of privileges and immunities' under the two conventions."  Def.'s R&R Resp. at 53 (emphasis in original) (quoting *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 391 (S.D.N.Y. 2002)).  As discussed in note 9, while other differences may exist,

*Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir. 1987) (permitting the plaintiff to bring tort claims alleging vandalism against a consular employee who lived in the house leased by the Consulate because the tortious acts were "not 'performed in the exercise of' the [the defendant's] consular function as a resident of the [] house, or of any of [the defendant's] other consular functions"); *State v. Doering-Sachs*, 652 So. 2d 420, 424 (Fla. Dist. Ct. App. 1995) (the defendant consular employee was not immunized from criminal prosecution for resisting arrest and aggravated assault where none of these acts were in furtherance of his consular duties to deliver consular documents).

The defendant's alleged criminal activity of creating and using shell companies and bank accounts to conceal her transactions in embezzled funds has neither "a logical connection" to the official responsibilities that the defendant was supposed to fulfill, nor provides "a reasonable means to the fulfillment" of any official function.'" *Berdakin v. Consulado de La Republica de El Salvador*, 912 F. Supp. 458, 463–464 (C.D. Cal. 1995) (articulating a two-pronged test to determine whether consular immunity applies to conduct alleged to have been "in the exercise of" a consular function (quoting *Gerritsen v. Escobar y Cordova*, 721 F. Supp. 253, 259 (C.D. Cal. 1988))).   Simply put, while residual immunity may bar legal action against even illegal acts performed by a diplomat in an effort to carry out diplomatic functions or duties successfully, when the activity being scrutinized was not necessary or a part of any official function or responsibility, the VCDR provides no protection.

## IV.    CONCLUSION

---

consular immunity and residual diplomatic immunity are both functional immunities, and, therefore, any analysis regarding whether an alleged act is "performed in the exercise of consular functions," Vienna Convention on Consular Relations art. 43, ¶ 1, is helpful to the pertinent analysis whether the charged acts are "performed . . . in the exercise of [the defendant's] functions as a member of the [diplomatic] mission," VCDR art. 39, ¶ 2.

The factual allegations providing the basis for the criminal complaint against the defendant were not an exercise of her official functions as a member of the mission and, therefore, no residual immunity bars the prosecution of the defendant for that charged criminal conduct.  Accordingly, the defendant's motion to dismiss the criminal complaint is denied.[11]

An order consistent with this Memorandum Opinion will be contemporaneously entered.

Date: May 2, 2016.

_____
BERYL A. HOWELL
Chief Judge

---

[11]   The government recently moved, on April 20, 2016, for a status hearing on the defendant's pending motion to dismiss.  *See* Gov't's Notice of Expiration of Speedy Trial Period and Request for Status Hearing, ECF No. 58; Gov't's Motion for Status Hearing, ECF No. 59 (referencing ECF No. 58).  Since the defendant's pending motion to dismiss is resolved in this Memorandum Opinion and accompanying Order, the government's motion for a status hearing is denied as moot.